**WILMERHALE**

**By Electronic Filing**

July 26, 2013

Hon. Jon S. Tigar, U.S. District Judge, NDCA
450 Golden Gate Avenue
San Francisco, CA 94102

Keith Slenkovich
+1 650 858 6110 (t)
+1 650 858 6100 (f)
keith.slenkovich@wilmerhale.com

Re: *Sage Electrochromics, Inc. v. View, Inc.*, Case No. 12-cv 06441 (JST)

Dear Judge Tigar:

    Defendant View, Inc. ("View") and Plaintiff Sage Electrochromics, Inc. ("Sage") submit this joint letter brief pursuant to the Court's May 20, 2013 Standing Order, regarding a dispute concerning the sufficiency of Sage's Patent L.R. 3–1 Infringement Contentions. The parties met and conferred on the issues presented on Tuesday, July 16, 2013 and remain at an impasse.

### I. <u>VIEW'S POSITION</u>

    View seeks an order striking Sage's Infringement Contentions with respect to U.S. Pat. Nos. 7,372,610 (the "'610 patent") and 5,724,177 (the "'177 patent"). View further seeks a stay of infringement related discovery and a stay of the Aug. 1, 2013 deadline for View to serve its Patent L.R. 3–3 Invalidity Contentions, pending resolution of this dispute. As demonstrated below, Sage's Infringement Contentions are irreparably deficient and should be stricken.

#### A. Background

    Sage filed its complaint on December 20, 2012, asserting infringement by View of the '177 and '610 patents. The '177 and '610 patents are directed to electrochromic devices (here, electrochromic window products), and more specifically, the composition and structure of certain material layers in the devices. Pursuant to the Court's Scheduling Order, Sage served its Patent L.R. 3–1 Infringement Contentions on June 12, 2013, asserting infringement by View of <u>all 21 claims</u> of the '610 patent and claims 4–6, 12–14, 16–17, and 19 of the '177 patent. *See* Sage's June 12, 2013 Disclosure of Asserted Claims and Infringement Contentions (Enclosed here for reference). Sage cited in support of its infringement theories: (1) View's website, (2) three third-party internet publications, and (3) the specification of a View patent. *See id.*

    On June 24, 2013, counsel for View sent a letter to Sage's counsel identifying the numerous deficiencies with Sage's Infringement Contentions and requesting that Sage confirm that its Contentions "incorporate all relevant facts known to it prior to filing suit." Sage's counsel responded that its Contentions "highlight the information available to SAGE at the time the contentions were due." View responded to Sage's letter on July 2, 2013 requesting an immediate meet and confer regarding the identified deficiencies with Sage's Contentions. The parties met and conferred on July 16, 2013 and remain at an impasse.

#### B. Legal Standard

    This dispute arises from Sage's failure to comply with Patent L.R. 3–1(c), which requires that a party claiming infringement identify "specifically where each limitation of each asserted claim is found within each accused product." Patent L.R. 3–1(c). "The purpose of Patent L.R.

July 26, 2013
Page 2

WILMERHALE

3–1 is to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *Digital Reg. of Texas, LLC v. Adobe Sys. Inc.*, 2013WL3361241, at *1 (N.D. Cal. July 3, 2013) (citations omitted).

The "degree of specificity [under Local Rule 3–1] must be sufficient . . . to raise a reasonable inference that all accused products infringe." *Id.* at *3. This standard "necessitates a level of detail that reverse engineering or its equivalent would provide." *Infineon Tech. v. Volterra Semiconductor*, 2013 WL 322570, at *4 (N.D. Cal. Jan. 28, 2013) (emphasis added); *see also Network Caching Tech., LLC v. Novell, Inc.*, 2002 WL 32126128, at *4–5 (N.D. Cal. Aug. 13, 2002) ("reverse engineering or its equivalent is required"); *Tessenderlo Kerley, Inc. v. OR-Cal, Inc.*, 2012 WL 1253178, at *2 (N.D. Cal. Apr. 13, 2012) ("To satisfy Rule 3–1 . . . reverse engineering or its equivalent are required") (citation omitted); *Digital Reg. of Texas, LLC*, 2013 WL3361241, at *1.[1] "Cases in which reverse engineering [is] not required . . . involve situations in which analyzing the accused product was either impracticable or unnecessary to create a basis for adequate ICs," such as claims involving confidential manufacturing processes. *Bender v. Maxim Integrated Prods., Inc.*, 2010 WL 2991257, at *5 (N.D. Cal. July 29, 2010) (emphasis added); *see also Hoffmann-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359 (Fed. Cir. 2000).

An order striking infringement contentions and staying further related discovery (including Patent L.R. 3-3 Invalidity Contentions) is the appropriate remedy where the plaintiff sets forth deficient contentions. *See, e.g., Theranos*, 2012 WL 6000798 at *7 (striking infringement contentions and staying "defendant's otherwise applicable discovery obligations in light of deficient infringement contentions'") (citations omitted); *Infineon Tech. v. Volterra Semiconductor*, 2012 WL 4808445, at *5 (N.D. Cal. Oct. 9, 2012) ("[c]ourts generally will stay a patent defendant's discovery obligations . . . including service of invalidity contentions" until the plaintiff complies with Patent L.R. 3–1); *Tessenderlo*, 2012 WL 1253178, at *6 ("this order agrees that the deadline for defendant's invalidity contentions should be extended").

### C.   Sage's Infringement Contentions for the '610 Patent are Deficient

Sage's Infringement Contentions for the '610 patent lack the requisite specificity necessary to put View on notice of its infringement theories, and fail to make the "reverse engineering or its equivalent" showing necessary to meet that standard. Rather, Sage's Contentions are entirely presumptive in nature, relying on third party news articles and an irrelevant disclosure in a View patent rather than actual analysis of View's products. Indeed, it is apparent that Sage has not conducted any analysis whatsoever of View's products—analysis that is neither "impracticable nor unnecessary" in the context of the '610 patent.[2] Moreover, the

---

[1]   *Theranos, Inc. v. Fuisz Pharma LLC*, 2012 WL 6000798, at *6 (N.D. Cal. Nov. 30, 2012) ("the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement") ( citations omitted).

[2]   Sage's infringement contentions make clear that Sage either has not conducted the requisite analysis of View's products or is improperly withholding this analysis from its Contentions. Even assuming that Sage attempted but was unable to acquire a sample of View's

July 26, 2013                                                                                                    WILMERHALE
Page 3

materials that Sage does rely upon fail to disclose meaningful technical details about View's products that are relevant for issues relating to the '610 patent. As a result, Sage's Infringement Contentions do not support a reasonable inference that View's products infringe, and fail to provide fair notice of Sage's infringement theories. *See, e.g., GN Resound A/S v. Callpod, Inc.*, 2013 WL 1190651, at *3 (N.D. Cal. Mar. 21, 2013) (striking contentions where plaintiff did not "point to the product itself or provide contentions based on any reverse engineering").

Illustratively, each of the 21 asserted claims of the '610 patent include (or depend from a claim including) the following limitation: "*said anodic counter electrode layer comprising lithium and a mixed tungsten-nickel oxide **substantially in crystalline form**.*" In support of its contention that the accused View products meet this limitation, Sage cites to a single source: View's '603 patent, and specifically, the following excerpt from the specification describing an alternative embodiment whereby the counter electrode "may be crystalline": "*The counter electrode morphology **may be** crystalline, nanocrystalline, **or amorphous**.*" *See* claim element 1[f] (citing '603 patent at 8:60–61).

Sage relies on this excerpt from View's '603 patent without any explanation as to how it allegedly corresponds to View's products. Instead, Sage supports its position by arguing that, because View (now) contends that it practices certain claims of the '603 patent, and because View's '603 patent does not "state that the morphology of the counter electrode must be amorphous," it is therefore *conceivable* that View's products *could* have a mixed tungsten-nickel oxide counter electrode "substantially in *crystalline* form." Sage's argument is fatally flawed for at least two reasons.

First, the passage in View's '603 patent *immediately following* the excerpt relied upon by Sage provides the following:

> [I]n some embodiments, where the counter electrode layer is nickel-tungsten oxide, **the counter electrode material is amorphous or substantially amorphous. Substantially amorphous nickel-tungsten oxide counter electrodes have been found to perform better, under some conditions, in comparison to their crystalline counterparts. The amorphous state of the nickel-tungsten oxide may be obtained through the use of certain processing conditions, described below**." '603 patent at 8:62–9:2.

So what the '603 patent actually describes—consistent with the structure of View's products—is a preferred embodiment precisely the *opposite* of what is claimed in Sage's '610 patent, and that therefore directly *contradicts* Sage's contention: i.e., it describes an amorphous, rather than crystalline, nickel tungsten oxide counter electrode layer. Sage's reliance on View's '603 patent therefore cannot conceivably satisfy the "reverse engineering or its equivalent" standard because the cited disclosure bears no relationship to the structure of View's products, nor is there any reasonable basis to conclude that it does.

---

products (which it has not demonstrated), Sage was under an obligation—before it sued View—to request from View information sufficient to evaluate its infringement theories. It did not do so. *See Hoffmann-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359 (Fed. Cir. 2000).

Second, in any event, this disclosure in View's '603 patent bears no relationship to View's claim that it practices the '603 patent. No claim of the '603 patent requires a mixed nickel-tungsten oxide counter electrode layer that is "substantially in crystalline form," so whether View practices certain claims of the '603 patent is irrelevant. *See* '603 patent, claims 1–21.

Sage's contentions for the '610 patent are replete with other similar deficiencies. For example, Sage relies exclusively on the specification of View's '603 patent for numerous other claim elements, again without explanation as to how these disclosures correspond to View's products. *See, e.g.,* claim element 1[c] (citing View's '603 patent to support its contention that View's products comprise an "ion conducting layer"); and claim 16 (citing the '603 patent to support its allegation as to the thicknesses of certain layers in View's products). For numerous other claim limitations, Sage's Infringement Contentions merely mimic the claim language, failing to specifically identify the corresponding structures in View's products. *See, e.g.,* claim 4 (failing to specify what "metal oxide" is alleged to be found in View's products); and claim 6 (failing to specify what "one or more metals" is used to "dope" said "metal oxide").

Further indicative of Sage's "shot in the dark" approach is the fact that Sage accused View's products of infringing all 21 claims of the '610 patent, notwithstanding that certain of the claims are mutually exclusive of one another. *Cf.* claim 10 ("wherein said conductive layers comprise the same metal oxide") and claim 11 ("wherein said conductive layers comprise different metal oxides"). In sum, it is apparent that Sage has no factual basis to assert these, nor any, claims of the '610 patent.

### D.   Sage's Infringement Contentions for the '177 Patent are Deficient

Sage's Infringement Contentions for the '177 patent are similarly deficient. As with its contentions for the '610 patent, Sage provides no analysis whatsoever of any actual View product alleged to infringe the '177 patent, relying instead on the very same third party publications and View patent specification to substantiate its infringement theories. Moreover, Sage's Contentions for numerous claim elements in the '177 patent simply mimic the claim language, failing to specifically identify the corresponding features in View's products. *See, e.g.,* claim element 4[f] (failure to specify what material or materials in View's products correspond to the "means for transporting lithium ions" in the '177 patent); claim element 4[g] (failure to specify what materials in View's products correspond to the "at least two electrically conductive layers" corresponding to the "conductive means"). In sum, as with the '610 patent, Sage's Infringement Contentions for the '177 patent once again fail to provide View with fair notice of its infringement theories.

For the foregoing reasons, View requests that the Court issue an order striking Sage's Infringement Contentions. View further requests an order staying View's corresponding discovery obligations, and, because Sage has failed to provide fair notice as to its infringement theories, a stay of View's deadline to serve its Patent L.R. 3–3 Invalidity Contentions.

Sage should not be allowed to circumvent the underlying purposes of Patent L.R. 3–1 by serving fundamentally deficient Infringement Contentions, and then embarking on a fishing expedition to see if it can find support for these unsupported contentions. Sage should not be

allowed to supplement its contentions using materials provided by View in discovery or in its disclosures.

## II. SAGE'S POSITION

### A. SAGE'S REQUESTED RELIEF

SAGE's infringement contentions for both the '610 patent and the '177 comply with Patent Local Rule 3-1. Accordingly, SAGE seeks an order denying View's request to strike SAGE's infringement contentions. View has not articulated any basis for why the parties cannot go forward with discovery in this case pending resolution of this dispute. Thus, SAGE also seeks an order denying View's request to stay discovery, including its invalidity contentions. Lastly, SAGE seeks an order compelling View to produce 6 samples of the accused product as requested many times by SAGE.

### B. SUMMARY

View does not contend that its products do not infringe the '177 and '610 patents. Rather, through clever hide-and-seek tactics, View seeks to avoid the question. View's products are not publically available. SAGE cannot walk into a retail store and purchase View's products. SAGE cannot buy View's products online. And View has told SAGE that it will not sell its products directly to SAGE. If View believes that it does not infringe either the '177 patent or the '610 patent, all it has to do is produce the samples of its products that SAGE has been asking for since February of this year.

SAGE requested samples of View's glass on February 19, 2013 before discovery opened. Since that initial request, as well as after additional ones, View led SAGE to believe that samples would be forthcoming. If View had provided the glass samples that SAGE requested, View's complaints regarding SAGE's infringement contentions, as misplaced as they are, would be moot. Now, View even refuses to comply with its formal discovery obligation to produce samples. View's evasiveness regarding the glass samples left SAGE with the next-best alternative under Patent L.R. 3-1 to show how the View accused products infringe the asserted SAGE patents – analyzing the publicly available information about View's product. This is proper and satisfies SAGE's notice obligations under Patent L.R. 3-1.

### C. BACKGROUND

On February 19, 2013, counsel for SAGE requested samples from View's outside counsel. View's counsel said they would get back to SAGE regarding this request. On March 29, 2013, SAGE's counsel sent an email once again requesting product samples. On April 1, 2013, SAGE's counsel sent another email to View's counsel asking for a "response to [SAGE's] request regarding samples." View's counsel responded by proposing that samples be discussed during the scheduled April 2, 2013 meet and confer regarding the case management statement. During that meet and confer, View's counsel stated that they were not opposed to some exchange of product samples but that they needed to confirm with their client, View. View's counsel further stated that any exchange would be dependent upon View receiving samples of SAGE's product and upon receiving further documentation on SAGE's highly-confidential manufacturing process. The parties dispute who was responsible for getting back to whom regarding the glass

samples following this call. But View never responded to SAGE's further request for View glass samples.

Discovery formally opened on May 8, 2013. Dkt. No. 48. On May 29, 2003, after nearly 4 months of trying to obtain samples by request, SAGE served its First Set of Document Requests. Request No. 5 sought "six samples of each View Product and View Embodiment, and every version or revision thereof." On June 4, 2013, View served its First Set of Requests for Production and Inspection . Request No. 2 sought, just as SAGE had sought, "Six (6) functional samples of each version (or revision) of each Sage Accused Product (including but not limited to "SageGlass" and "Quantum Glass") made, used, sold, or offered for sale by you." On July 1, 2013, View responded to SAGE's Request No. 5. Despite the fact that View had itself requested essentially the same thing regarding glass samples, and despite the fact that SAGE had requested glass samples multiple times in correspondence and meet and confers, View responded by saying, once again, "it is willing to meet and confer with [SAGE] to reach a reasonable agreement regarding the mutual exchange of glass samples."

On July 3, 2013, SAGE's counsel sent another email request for six samples of View's product. View did not respond. On July 12, 2013, SAGE asked that samples be included in the July 16, 2013 meet and confer regarding the parties' complaints regarding their respective infringement contentions. During this meet and confer, SAGE again requested glass samples. At this meet and confer, View informed SAGE's counsel for the first time that View would not produce samples of its products. Following the meet and confer, counsel for SAGE sent another email to View offering to pay for View's products. SAGE's counsel asked for permission to contact View to purchase the product and asked counsel for View to ensure that any order from SAGE or SAGE's counsel would not be rejected. Counsel for View responded by saying that SAGE does not have View's permission to directly or indirectly contact View or any View affiliate to effectuate this 'purchase,' and that any such contact would be highly improper in light of the parties' ongoing litigation.

View continuously refuses to allow SAGE to obtain samples of its product, either through discovery or by purchasing the product. The facts outlined above illustrate the difficulty SAGE has experienced in trying to lawfully obtain samples of View's product. SAGE has been stopped at every turn. View should not benefit from these tactics.

### D. THE LEGAL STANDARD

The patent local rules in this district require that each party claiming infringement identify "specifically where each limitation of each asserted claim is found within each asserted product." Patent L.R. 3-1(c). The degree of specificity must be sufficient to provide reasonable notice to the defendant why the plaintiff believes it has a reasonable chance of proving infringement and raise a reasonable inference that all accused products infringe. *Digital Reg. of Texas, LLC v. Adobe Systems, Inc.*, 2013 WL3361241 at *3 (N.D. Cal. July 3, 2013, J. Westmore). Patent L.R. 3 does not, however, "require the disclosure of specific evidence [or] require a plaintiff to prove its infringement case." *Creagri Inc. v. Pinnaclife,* 2012 WL 5389775 at *2 (N.D.Cal. Nov. 2, 2012, J. Grewal). To the extent appropriate information is reasonably available to a party, "a patentee must nevertheless disclose the elements in each accused instrumentality that it contends practices each and every limitation of each asserted claim." *Id.*

Some courts in this district have stated that "to satisfy Rule 3–1 . . . reverse engineering *or its equivalent are required*"). *Id. at *1* (emphasis added).

"Cases in which reverse engineering [is] not required . . . involve situations in which analyzing the accused product was either impracticable or unnecessary to create a basis for adequate ICs," such as claims involving confidential manufacturing processes. *Bender v. Maxim Integrated Prods., Inc.*, 2010 WL 2991257 at *5 (N.D. Cal. July 29, 2010, J. Illston). In such cases, courts have held that the use of publicly available marketing materials and advertisements are sufficient. *Creagri*, 2012 WL 5389775 at *4. Moreover, courts have recognized that there are times when a plaintiff's preparation is restricted by defendant's sole possession of the information plaintiff needs. *France Telecom v. Marvel*, N.D. Cal., Case No. 12-cv-04967 WHA (NC), May 3, 2013 at page 6. In such situations, Pat. L.R. 3-1 requires that plaintiff identify how the "products infringe with as much specificity as possible *with the information currently available to it*." *Id.* at 6. (*citing Creagri*, 2012 WL 5389775 at *3 (emphasis added)). This is precisely why the local rules provide for supplementation of infringement contentions when "nonpublic information about the Accused Instrumentality which was not discovered, despite diligent efforts, before the service of the Infringement Contentions." Pat. L.R. 3-6(c). This is also why the parties, in their draft case schedule submitted to the Court agreed on a date to amend the infringement and invalidity contentions served in this case – something parties often do in patent cases in this district. Dkt. No. 48 at page 15, line 2.

### E. SAGE'S '610 INFRINGEMENT CONTENTIONS ARE SUFFICIENT

View's complaint regarding SAGE's '610 patent infringement contentions boils down to the fact the SAGE did not reverse engineer View's unobtainable product. SAGE has not reversed engineered View's product. Despite its best efforts, SAGE was unable to legally secure View's products prior to serving its infringement contentions.

Technical public information about View's products is sparse. View's own website, viewglass.com, fails to provide any detailed technical information related to its electrochromic stack, materials used in the manufacture of that the stack, or the process used to manufacture the product. However, through its pre-suit investigation, SAGE was able to learn through public statements, many attributed to View's CEO, various details of View's product. Further, View's patents and patent applications confirm those public technical statements. View cannot have it both ways – having refused to provide samples to SAGE, it cannot now complain that SAGE has not utilized reverse engineering in developing its Pat. L.R. 3-1 contentions.

View's specific complaint appears to be that SAGE cannot definitively prove at this time that View's counter electrode morphology is substantially crystalline. View's description from its asserted '603 patent states that "[t]*he counter electrode morphology **may be** crystalline, nanocrystalline, **or amorphous***." Dkt. No. 58, Exh. C ('603 patent, col. 8, lines 60-61). While it is true that the '603 patent goes on to tout the supposed advantages of a substantially amorphous nickel-tungsten oxide counter electrode, the patent does not foreclose the possibility of using a substantially crystalline counter electrode. *Id.* (col. 8, lines 62-67).

July 26, 2013                                                                                               WILMERHALE
Page 8

Further support for SAGE's infringement theory regarding the counter electrode is View's U.S. Pat. No. 8,300,298[3] titled "Electrochromic Device" that issued on October 30, 2012. This patent shows and describes a crystalline counter electrode. '298 patent, col. 2, lines 64-65 (*See Fig. 7, Pattern 710a describing the CE [counterelectrode] as polycrstystline*); *see also Id.*, col. 28, lines 51-53 ( *the CE layer is described as NiWO, about 230 nm thick.*). Compelling View to produce samples of the accused product will allow SAGE to finally confirm that the counter electrode is substantially crystalline.

Some of View's other concerns relate to what exact materials make up the various layers, the thicknesses of those materials and the percentages of various materials present in each layer of the accused product. As highlighted by Judge Grewal in the *Creagri* case, such a degree of specificity is not required at this stage. *Creagri*, 2012 WL 5389775 at *2 and *4. View also complains of the mutually exclusive nature of claims 10 and 11 of the '610 patent. Again this is much ado about nothing. Compelling View to provide samples will allow SAGE to determine whether the conductive layers are the same metal oxide or not.

### F.     SAGE'S '177 INFRINGEMENT CONTENTIONS ARE SUFFICIENT

View's complaint about SAGE's infringement contentions related to the '177 patent appear to also be that SAGE did not reverse engineer View's product. Again, this was not possible prior to the service of infringement contentions because View failed to provide samples and SAGE was unable to obtain sample from other legal sources.

Regarding the specific complaints about what "materials" comprise the means for transporting lithium ions, SAGE's infringement contention points to the ion conducting layer of View's electrochromic stack. While the specific material of that layer is not known to SAGE at this time, that information is not required to comply with Local Patent Rule 3-1(c). *See Creagri* at *2-3. View's complaints about element 4[g] of the '177 patent are similarly flawed. View does not and cannot dispute its electrochromic stack is sandwiched between two conducting oxide films. These oxide films are exactly what SAGE identified in its infringement contentions. Again, the specific materials that make up these films are not known to SAGE at this time. However, this degree of specificity is not required by Pat. L.R. 3-1(c). *See Creagri* at *2-3.

### G.     CONCLUSION

This dispute has a simple solution: compel View to provide samples of its products. Then SAGE can do the analysis View suggests it wants. In the meantime, SAGE's infringement contentions comply with the spirit and scope of Local Patent Rule 3-1(c). View has full knowledge of SAGE's infringement theories. View's requested relief should be denied and SAGE's requested relief should be granted.

---

[3]      SAGE did not cite to the '298 patent in its infringement contentions because View's asserted '603 patent confirmed SAGE's pre-suit belief that the counter-electrode of View's product is substantially crystalline.

July 26, 2013
Page 9

WILMERHALE

Respectfully submitted,

*/Keith Slenkovich/*

Keith Slenkovich

Enclosure

### SIGNATURE OF ATTESTATION

Pursuant to Civil L.R. 5.1(i)(3), I hereby attest that I have obtained the concurrence in the filing of this document from all parties within this e-filed document and I have on file records to support this concurrence for subsequent production for the Court if so ordered or for inspection upon request.

Dated: July 26, 2013

*/Keith Slenkovich/*
Keith Slenkovich

### CERTIFICATE OF SERVICE

I, Keith Slenkovich, hereby certify:

I am over the age of 18 and not a party to the within action. My business address is 950 Page Mill Road, Palo Alto, CA 94304. On July 26, 2013, I served the within document via the court's electronic filing system to counsel of record.

I declare under penalty of perjury that the above is true and correct.

Executed on July 26, 2013, in Palo Alto, California.

*/Keith Slenkovich/*
Keith Slenkovich