TERRENCE P. MCMAHON (SBN: 71910)
TERRY W. AHEARN (SBN: 216543)
McDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 94025-4004
Telephone:     +1 650 815 7400
Facsimile:      +1 650 815 7401
tmcmahon@mwe.com
tahearn@mwe.com

SARAH CHAPIN COLUMBIA (admitted *pro hac vice*)
LEIGH MARTINSON (admitted *pro hac vice*)
HASAN M RASHID (admitted *pro hac vice*)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston, Massachusetts 02109
Telephone:     (617) 535-4000
Facsimile:      (617) 535-3800
scolumbia@mwe.com
lmartinson@mwe.com
hrashid@mwe.com

Attorneys for Plaintiff and Counterclaim Defendant
*SAGE Electrochromics, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **SAGE ELECTROCHROMICS, INC.**, a New Jersey Corporation,<br><br>        Plaintiff and Counterclaim-Defendant,<br><br>   v.<br><br>**VIEW, INC.**, a Delaware Corporation,<br><br>        Defendant and Counterclaim-Plaintiff. | CASE NO. C 12-06441 (JST)<br><br>**SAGE ELECTROCHROMICS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

TABLE OF CONTENTS

**Page(s)**

I. Introduction ................................................................................................. 1

II. Background ................................................................................................. 1

III. Legal Standards .......................................................................................... 4

   A. Tenets of Claim Construction ............................................................. 4

   B. Means-Plus-Function Terms .............................................................. 5

IV. SAGE's '177 Patent .................................................................................... 7

   A. Claims of the '177 Patent ................................................................... 7

   B. "transporting means" ......................................................................... 8

     1. The "transporting means" is not limited to the exemplary materials. ......................... 10

     2. The "transporting means" need not be "a layer." ....................................... 12

   C. "enhancing means" ........................................................................... 13

     1. The "enhancing means" is not limited to the disclosed configurations. ................... 15

     2. The "enhancing means" is not limited by its material composition. ..................... 19

     3. The "enhancing means" need not be comprised of layers. ............................. 20

   D. "superstrate" ..................................................................................... 20

V. SAGE's '610 Patent .................................................................................... 22

   A. Claims of the '610 Patent ................................................................. 22

   B. "ion-conductor [-ing] layer" ............................................................. 22

     1. The ion conductor layer need not be "deposited" .................................... 23

     2. The ion-conductor[-ing] layer need not entirely block electric current. ............... 25

VI. Conclusion ................................................................................................ 25

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AstraZeneca Pharms. LP v. Teva Pharms. USA, Inc. (In re Rosuvastatin Calcium Patent Litig.),*No. 08-1949 et al.,
2009 U.S. Dist. LEXIS 37649, at *23 (D. Del. 2009) ........................................................... 23

*Atmel Corp. v. Information Storage Devices,*
198 F.3d 1374 (Fed. Cir. 1999) ............................................................................................... 6

*Aventis Pharma S.A. v. Hospira, Inc.,*
675 F.3d 1324 (Fed. Cir. 2012) ............................................................................................... 5

*Creo Prods., Inc. v. Presstek, Inc.,*
305 F.3d 1337 (Fed. Cir. 2002) ............................................................................................... 6

*Eon Corp. IP Holdings LLC v. Aruba Networks*, No. 12-cv-01011-JST,
2013 U.S. Dist. LEXIS 95003 (N.D. Cal. July 8, 2013) .................................................... 5, 6

*Kara Tech, Inc v. Stamps.com Inc.,*
582 F.3d 1341 (Fed. Cir. 2009) ............................................................................................... 5

*Keithley v. Homestore.com, Inc.,*
No. 03-cv-04447-MJJ, 2007 U.S. Dist. LEXIS 71126 (N.D. Cal. Sept. 10, 2007) ......... passim

*Laitram Corp. v. Morehouse Indus., Inc.,*
143 F.3d 1456 (Fed. Cir. 1998) ............................................................................................. 12

*Linear Tech. Corp. v. Impala Linear Corp.,*
379 F.3d 1311 (Fed. Cir. 2004) ........................................................................................ passim

*Markman v. Westview Instruments, Inc.,*
517 U.S. 368 (1996) ................................................................................................................. 4

*Micro Chem., Inc. v. Great Plans Chem. Co.*
194 F.3d 1250 (Fed. Cir. 1999) ........................................................................................ passim

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
357 F.3d 1340 (Fed. Cir. 2004) ............................................................................................. 12

*Network Appliance, Inc. v. Sun Microsystems, Inc.*, No. 07-06053-EDL,
2008 U.S. Dist. LEXIS 76713 (N.D. Cal. 2008) .................................................................. 24

*NTP, Inc. v. Research in Motion, Ltd.*
418 F.3d 1282 (Fed. Cir. 2005) ............................................................................................. 12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................................................... 4, 5, 21

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ................................................................................... passim

*Tristrata, Inc. v. Microsoft Corp.*,
    No. 11-cv-03797-JST, 2013 U.S. Dist. LEXIS 149152 (N.D. Cal. Oct. 15, 2013) ......... passim

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*
    234 F.3d 1370 .............................................................................................................. 23

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..................................................................................... 5, 18

*Wenger Mf'g. v. Coating Machinery Sys.*,
    239 F.3d 1225 (Fed. Cir. 2001) ................................................................................... passim

STATUTES

35 U.S.C. § 112(f) .................................................................................................................... passim

OTHER AUTHORITIES

L.R. 4-5(a) .................................................................................................................... 1, 2, 3

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

## I.   INTRODUCTION

Pursuant to the Court's Scheduling Order (D. 57) and Patent L.R. 4-5(a), SAGE Electrochromics, Inc. ("SAGE") submits its opening claim construction brief directed to the patents that it asserts: U.S. Patent Nos. 5,724,177 ("'177 Patent") and 7,372,610 ("'610 Patent") (collectively "the SAGE Patents").[1,2]  The meanings of four terms are at issue.  In the '177 Patent, the parties dispute the meanings of the "transporting means," "enhancing means," and "superstrate" terms.  In the '610 Patent, the parties dispute the meaning of "ion conductor [-ing] layer."

A review of View's proposed constructions and support unmasks a common theme shared by many defendants in patent cases.  Without fail, for each of the terms in the SAGE Patents, View asks the Court to improperly limit the terms to the precise embodiments disclosed in the SAGE Patents.  The specifications of the SAGE Patents explain that these embodiments are preferred and not limiting.  A fundamental canon of claim construction is that patent claims should not be limited to preferred embodiments.  This principle applies equally to the means-plus-function terms at issue.  View asks this Court to diverge from this established precedent.  SAGE, on the other hand, proposes constructions that adhere to Federal Circuit and this Court's precedent.  For these reasons, the Court should adopt SAGE's proposed constructions.

## II.   BACKGROUND

The SAGE Patents cover pioneering inventions in the field of electrochromic materials and devices.  "Electrochromic" describes a material that changes colors when an electric potential (voltage) is applied.  Ex. A,[3] '177 Patent at 1:19-21.  An electrochromic device can transition from clear to opaque with the flip of a simple switch.  *Id.* at 1:18-37.  This feature is useful in a

---

[1] View, Inc. ("View") is also asserting two patents against SAGE.  SAGE will address the disputed terms in those patents in SAGE's responsive brief.

[2] Although SAGE is also asserting invalidity and non-infringement of View's U.S. Patent No. 8,432,603 – for which View is no longer asserting infringement – the parties have not raised any claim construction issues relating to the terms therein.

[3] "Ex. __" refers to the like identified exhibit attached to the Declaration of Hasan Rashid in Support of SAGE's Opening Claim Construction Brief.

1  number of applications, including windows. *Id.* at 1:38-44. For example, electrochromic

2  windows can be used to control sunlight and reduce energy consumption. *Id.*

3      SAGE pioneered the electrochromic glass industry over twenty years ago. In fact, the

4  '177 Patent stems from an application filed in 1991.[4] Since its inception, SAGE has continued to

5  lead the industry's research and development, earning over 200 patents along the way. The '610

6  Patent, filed in 2006, is one example of SAGE's continued innovation. In recognition of its

7  accomplishments, SAGE has received numerous awards, including The Wall Street Journal's

8  Technology Innovation Award, Bloomberg's New Energy Pioneer Award, Architectural

9  Products' Innovation Award, Sustainable Industry's Top 10 Green Products Award, and the

10  BATIMAT International Innovation Award. Without question, SAGE is the industry leader in

11  innovation.

12      Electrochromic devices typically include different materials on a substrate, such as a glass

13  window. *Id.* at 5:34-41. The devices are generally constructed in what is referred to as a

14  "sandwich." They often include, for example, "an electrically conducting material, an electrode

15  formed from a layer of an electrochromic material, an ion conductive layer, a counterelectrode

16  layer, and another electrically conductive

17  layer." *Id.* at 1:24-28; *see also id.* at

18  5:34-41. The two electrically conducting

19  materials are connected to a voltage

20  source for establishing an electric

21  potential across the materials sandwiched



22  between them. *Id.* at 1:28-37; 5:41-43. As their name indicates, the electric conductors conduct

23  electricity so that the electric potential from the battery is spread throughout the full area of the

24  material. *See id.* The materials between the electrically conductive layers – the counterelectrode,

25  ion conductor, and electrochromic electrode – are often called the electrochromic structure or

26  stack.

27

28  [4] SAGE is an acronym for the assignee listed on the face of the '177 Patent, Sun Active Glass Electrochromics, Inc.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

When the switch is closed, the electric potential across the electrically conductive materials triggers a flow of ions in the electrochromic stack.  Specifically, ions flow from the counterelectrode (also known as an ion storage layer) to the electrochromic electrode.  *Id.* at 1:28-37; 5:43-67.  Electrochromic material in the electrochromic electrode reacts to this insertion of ions.  *Id.*  This reaction causes the eletrochromic material to color or darken.  *Id.*  In short, closing the switch darkens the electrochromic electrode, rendering the device opaque.  *Id.*  If the ion conductor is electrically insulating (which is not required), then the electrochromic material will "remember" and maintain this opacity upon re-opening of the switch.  *Id.* at 5:57-60; *see also* Ex. B, U.S. Patent No. 6,859,297 at 3:24-29.

If the polarity of the battery is reversed – establishing an electric voltage in the opposite direction – then the ions will flow in the reverse direction.  '177 Patent at 5:60-67.  The ions will leave the electrochromic electrode and flow back to the ion storing counterelectrode.  *Id.* This reversal causes the electrochromic material to "bleach," rendering the device clear again.  *Id.*  In this manner, electrochromic glass can be transitioned from clear to opaque and back again using a simple electric switch.

Although the SAGE Patents generally adhere to these fundamental principles of electrochromics, they also include innovations that changed and developed the industry for electrochromic glass.  For example, before the SAGE innovations, a common consequence of adding an electrochromic device onto a transparent glass substrate was that the "optical transparency of these devices [was] compromised."  *Id.* at 1:59-64.  An electrochromic window with compromised transparency is not much of a window.  The inventors of the SAGE Patents discovered what others did not – an enhancing means that manipulates the behavior of light through the electrochromic device ameliorates the impact the electrochromic device has on optical transparency.  *See, e.g., id.* at 9:48-64.  With this innovation, SAGE earned the '177 Patent, which issued fifteen years ago.

In the '610 Patent, SAGE inventors continued improving on the basic principles and structure detailed above.  Prior to the '610 Patent, known counterelectrode materials suffered from a number of disadvantages, including discoloration and long-term instability.  Ex. C, U.S.

Patent No. 7,372,610 at 1:33-2:34 ("'610 Patent").  SAGE's researchers overcame these disadvantages.  Among other things, SAGE discovered that an electrochromic device subjected to heat treatment and having a counterelectrode layer made of mixed tungsten-nickel oxide substantially in crystalline form corrected the previous disadvantages in the prior art.

In these claim construction proceedings, View tries to improperly reduce the impact and scope of SAGE's pioneering efforts and patents.  To generate non-infringement arguments, View seeks to limit SAGE's claims to the exact exemplary embodiments described in the SAGE Patents.  View's attempts to diminish SAGE's pioneering patents should be rejected.

## III.   LEGAL STANDARDS

### A.   Tenets of Claim Construction

The claims of a patent define the invention and the patentee's right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); s*ee also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("It is the claims [of a patent] that define the metes and bounds of the patentee's invention.").  Determining the meaning of a term is a matter of law, akin to contract interpretation.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 368, 387 (1996).

A court should first look to the claims themselves.  *Phillips*, 415 F.3d at 1312; *Tristrata, Inc. v. Microsoft Corp.*, No. 11-cv-03797-JST, 2013 U.S. Dist. LEXIS 149152, at *11 (N.D. Cal. Oct. 15, 2013).  A term should be construed according to its ordinary meaning to one skilled in the art at the time of invention.  *Phillips*, 415 F.3d at 1312.  The only instance where a court may deviate from the plain and ordinary meaning is "(1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner*, 669 F.3d at 1365.  The claims themselves can inform the meaning of a claim term in a number of ways.  For example, surrounding claim language may offer context clues on the usage and meaning of a term.  *Phillips*, 415 F.3d at 1314.  Or, for example, differences between claims may shed light on the scope and meaning of a claim term.  *Id.* at 1314-15.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

The claims should be read in the context of the specification. *Id.* at 1315. The ordinary meaning of a term is the meaning to one skilled in the art having read the entire patent. *Id.* at 1313. The specification "is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). That does not mean, however, that a term's meaning should be limited to disclosed or preferred embodiments in the specification. *Id.*; *see also Kara Tech, Inc v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The claims, not specification embodiments, define the scope of patent protection."). Indeed, while the specification may be used to inform the meaning of a term, "[w]e do not read limitations from the specification into claims; we do not redefine words." *Thorner*, 669 F.3d at 1366. The specification limits a term's ordinary meaning when the patentee either sets out a definition, acting as a lexicographer, or disavows some or all of the scope of a claim term. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (quoting *Thorner*, 669 F.3d at 1365).

**B.     Means-Plus-Function Terms**

The use of the word "means" in a claim creates a presumption that 35 U.S.C. § 112(f)[5] applies. *Wenger Mf'g. v. Coating Machinery Sys.*, 239 F.3d 1225, 1232 (Fed. Cir. 2001); *Micro Chem., Inc. v. Great Plans Chem. Co.* 194 F.3d 1250, 1257 (Fed. Cir. 1999); *Tristrata*, 2013 U.S. Dist. LEXIS 149152, at *38. Section 112(f) provides as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

This provision allows an inventor to claim a "means for" performing a function without claiming every possible means that might be used to perform the function. *Eon Corp. IP Holdings LLC v. Aruba Networks*, No. 12-cv-01011-JST, 2013 U.S. Dist. LEXIS 95003, at *13 (N.D. Cal. July 8, 2013). "[A]n inventor can describe an element of the invention by the result accomplished or the function served, rather than by describing the item or element to be used." *Keithley v.*

---

[5] The recent Leahy-Smith America Invents Act reformatted the paragraphs of § 112 as subsections. Former paragraph 6 is now subsection (f).

*Homestore.com, Inc.*, No. 03-cv-04447-MJJ, 2007 U.S. Dist. LEXIS 71126, at *38 (N.D. Cal. Sept. 10, 2007) (citing *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 27 (1997)).  The *quid pro quo* for invoking the convenience of a means-plus-function term is a corresponding duty to link disclosed structure to the claimed function.  *Id.*; *Eon Corp.*, 2013 U.S. Dist. LEXIS 95003, at *13.

When "construing a means-plus-function limitation, a court must identify both the claimed function and the corresponding structure in the written description for performing that function." *Wenger*, 239 F.3d at 1233 (citing *Micro Chem.*, 194 F.3d at 1258); *Tristrata*, 2013 U.S. Dist. LEXIS 149152, at *39.  The determination of the claimed function and corresponding structure is a question of law.  *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1321 (Fed. Cir. 2004).  The claimed function is often signaled by the preposition "for" in a "means for" performing the claimed function.  *See, e.g., Micro Chem.*, 194 F.3d at 1258.

The corresponding structure is that which one skilled in the art would understand corresponds to the claimed function.  *Tristrata*, 2013 U.S. Dist. LEXIS 149152, at *39.  "A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures." *Micro Chem.*, 194 F.3d at 1258.  "[T]he inquiry asks first whether structure is described in specification, and, if so, whether one skilled in the art would identify the structure from that description." *Atmel Corp. v. Information Storage Devices*, 198 F.3d 1374, 1381 (Fed. Cir. 1999).  This is the structure that one skilled in the art understands would be necessary to perform the claimed function.  *Wenger*, 239 F.3d at 1233; *Micro Chem.*, 194 F.3d at 1258.  The structure may embrace more than the preferred embodiment.  *Wenger*, 239 F.3d at 1233; *see also Micro Chem.*, 194 F.3d at 1258.  Although § 112(f) "prevents an overly broad construction by requiring reference to the specification, [it] at the same time precludes an overly narrow construction that would restrict coverage solely to those means expressly disclosed in the specification." *Keithley*, 2007 U.S. Dist. LEXIS 71126, at *39 (quoting *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575 (Fed. Cir. 1991) (internal quotes omitted)).  "Proper application of § 112[(f)] generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function." *Creo Prods., Inc. v.*

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

*Presstek, Inc.*, 305 F.3d 1337, 1346 (Fed. Cir. 2002).  Thus, the structure corresponding to a claimed function is that which one skilled in the art would identify in the specification as being useful to perform the claimed function, plus equivalents.  *Wenger*, 239 F.3d at 1233; *Micro Chem.*, 194 F.3d at 1258.

## IV.   SAGE'S '177 PATENT

### A.   Claims of the '177 Patent

The parties dispute the meaning of three terms: "transporting means," "enhancing means," and "superstrate," the last of which is not required in all claims.  The inventions claimed in the '177 Patent generally adhere to the structure outlined above in Section II.  Claim 17 is representative:

> 17. An electrochromic combination, comprising
> a **substrate**, and
> an **electrochromic device** arranged on said substrate, said electrochromic device including
> > an **electrochromic structure** having
> > > an **electrode** formed from an electrochromic material,
> > > a **counterelectrode** and
> > > **transporting means** consisting of only a single layer for transporting ions between said electrode and said counterelectrode,
> > **conductive means** including at least two electrically conductive layers sandwiching said electrochromic structure for applying an electric potential across said electrochromic structure,
> > > at least one of said electrically conductive layers between said electrochromic structure and said substrate including a transparent conductive oxide and excluding a metal layer, and
> > **enhancing means** for enhancing the transmission of radiation through said at least one of said electrically conductive layers, said enhancing means including at least one optically transparent layer including silicon dioxide in surface contact with said substrate.

'177 Patent at 17:15-35 (emphasis added).

The "enhancing means" is not only a term whose meaning is disputed, but it is also an important aspect of the claimed electrochromic combinations of the '177 Patent.  An objective of electrochromic devices is that "optical transparency of these devices will not be compromised" once an electrochromic stack is added to a substrate.  *Id.* at 1:59-64.  In the early 1990s, there "exist[ed] a need for improved electrochromic devices which will provide acceptable appearance when used over large surface areas."  *Id.* at 2:8-10.  At that time, the inventors of the '177 Patent invented an electrochromic device with "optical tuning."  *See, e.g., id.* at 8:14-9:64.  The

1   inventors discovered what others did not: optical tuning through an enhancing means helps

2   overcome the obstacle of maintaining optical transparency of an electrochromic device.

3       The other two terms whose meanings are in dispute are "transporting means for" and

4   "superstrate."  The "transporting means" term generally corresponds to the ion conducting

5   material described in Section II through which ions flow from the counterelectrode to the

6   electrochromic electrode.  The "superstrate" term – which is not in all of the claims – generally

7   refers to a material that provides protection and support to the electrochromic device on the side

8   opposite the substrate.

9       **B.**    **"transporting means"**

10      At issue are three versions of the "transporting means" claim terms.  All of them relate to

11  transporting ions between an electrode and counterelectrode.[6]  One of the "transporting means"

12  claim terms is limited to transporting lithium ions (versus, for example, hydrogen ions).[7]  Another

13  of the "transporting means" claim terms is limited to a transporting means consisting of a single

14  layer.[8]  Given the similarities of the issues surrounding these terms, the analysis below is directed

15  to all three versions of "transporting means" claim terms.

16

| **Joint Proposed Construction** | |
| --- | --- |
| The Parties agree that this term should be construed pursuant to 35 U.S.C. ¶ 112(f).  The parties also agree what the function is.  The parties disagree as to the corresponding structure. | |
| Function (agreed): transporting [lithium][9] ions between said electrode and said counterelectrode | |
| **SAGE's Proposed Structure** | **View's Proposed Structure** |
| Structure for "lithium ion" terms: one or more lithium ion conducting materials, for example<br><br>• lithium silicate, lithium borosilicate, lithium aluminum silicate, lithium niobate, lithium nitride, or lithium aluminum fluoride,[10] | Structure for "lithium ion" terms: a layer made from<br><br>• lithium silicate, lithium borosilicate, lithium aluminum silicate, lithium niobate, lithium nitride, lithium aluminum fluoride, |

---

[6] Asserted claims 4, 6, 12, 13, 17, and 19 of the '177 Patent have this recitation.
[7] Claims 4 and 12 add that the "transporting means [is] for transporting **said lithium** ions."
[8] Claims 17 and 19 add that the "transporting means **consist[s] of only a single layer**."
[9] The parties agree that "lithium" should be inserted here for claims 4 and 12 of the '177 Patent.
[10] The parties agree that the structure should at least include these materials disclosed at col. 2,

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

| | |
|---|---|
| • mixtures of lithium silicate and titanium or zirconium,[11] <br> • lithium ion conducting polymers,[12] <br> • lithium based inorganic films, solid, and inorganic electrolytes, <br> and their equivalents.[13] <br><br> Structure for terms not limited to lithium ions: [a single layer of][14] one or more ion conducting materials. | • mixtures of lithium silicate and titanium or zirconium, <br> • or a polymer material <br><br><br><br> Structure for terms not limited to lithium ions: a [single] layer made from <br> • lithium silicate, lithium borosilicate, lithium aluminum silicate, lithium niobate, lithium nitride, lithium aluminum fluoride, <br> • tantalum pentoxide, silicon dioxide, <br> • mixtures of lithium silicate and titanium or zirconium, <br> • or a polymer material. |

The parties agree that: (1) the "transporting means" terms should be construed under 35 U.S.C. § 112(f); and (2) the corresponding claimed function is "transporting [lithium] ions between said electrode and said counterelectrode."[15]

The parties dispute the structure corresponding to the claimed function. SAGE proposes that the structure necessary to perform the function is "one or more [lithium] ion conducting materials." For the lithium ion transporting means, SAGE also identifies in its construction examples of such materials, which are enumerated in the specifications of the '177 Patent and its parent, U.S. Patent No. 5,321,544. View, on the other hand, asserts that the structure is a layer that must be made only of one of the exemplary materials listed in the '177 Patent.

lines 47-51 and col. 6, lines 24-28 of the '177 Patent.
[11] The parties agree that the structure should at least include these materials disclosed at col. 10, lines 22-25 of the '177 Patent.
[12] The parties agree that the structure can be a lithium ion conducting polymer material, as disclosed at col. 6, lines 30-31 of the '177 Patent.
[13] SAGE slightly amended its originally proposed construction (D. 90) to clarify grammatical ambiguity.
[14] The parties agree that the structure should be limited to a single layer for claims 17 and 19 of the '177 Patent.
[15] The phrase "means for" is presumed to invoke § 112(f), and the claims function is signaled by the preposition "for": "transporting [lithium] ions between said electrode and said counterelectrode."

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

**1.      The "transporting means" is not limited to the exemplary materials.**

The pertinent question regarding structure is what one skilled in the art would understand to be the structure necessary to perform the claimed function. *Wenger*, 239 F.3d at 1233; *Micro Chem.*, 194 F.3d at 1258; *Tristrata*, 2013 U.S. Dist. LEXIS 149152, at *39. The corresponding structure necessary to perform the function of conducting ions is one or more [lithium] ion conducting materials and their equivalents. The specification states that the "transporting means desirably includes at least one layer formed from an ion conducting material." '177 Patent at 2:39-41. It is used to transport ions upon the application of an electric potential. *Id.* at 6:14-24. This structure, one or more ion conducting materials, is all that is necessary to perform the function of transporting ions.

View's proposal to limit the claim term to the specific materials listed in the specification should be rejected. It would be improper to limit the corresponding structure to only the preferred and alternative embodiments described in the specification. "[A] court may not import . . . structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger*, 239 F.3d at 1233 (reversing decision that "air circulation means" must also provide for recirculation, an alternative feature of the preferred embodiment). "When multiple embodiments in the specification correspond to the claimed function, proper application of § 112[(f)] generally reads the claim element to embrace each of those embodiments." *Micro Chem.*, 194 F.3d at 1258 (finding error in overlooking alternative embodiments of "weighing means"). Here, the necessary structure for transporting ions is one or more ion conducting materials. It is not necessary that the material be lithium silicate, lithium borosilicate, lithium aluminum silicate, or any other disclosed materials. View improperly seeks to limit the literal scope of the "transporting means" to these listed materials. To limit the structure to only these preferred embodiments would be error. Section 112(f) is intended to preclude such "an overly narrow construction that would restrict coverage solely to those means expressly disclosed in the specification." *Keithley*, 2007 U.S. Dist. LEXIS 71126, at *39.

The situation here is analogous to *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004). In that case the relevant dispute centered on the structure for "a second

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   means . . . to vary the duty cycle of the switching transistors." *Linear Tech.*, 379 F.3d at 1321.

2   Specifically, the issue centered on the generic disclosure of pulse width modulation ("PWM")

3   circuits.[16]  The district court held that the structure must be a specific circuit for performing the

4   function.  *Id.* at 1321-22.  Reversing the district court, the Federal Circuit held that "persons of

5   skill in the art would understand that 'PWM circuit' references a known class of circuit structures

6   that perform known functions."  *Id.* at 1322.  The criterion is whether the class of structures is

7   identifiable by skilled artisans.  *Id.*  Because the class was known, the Federal Circuit reversed the

8   court's decision requiring one specific circuit.

9        The inventors of the '177 Patent similarly identified a class of structures in their

10  application – ion conducting materials.  Their inclusion of examples in that class does not limit

11  the identifiable class of structures necessary to perform the function of transmitting ions.  Indeed,

12  contemporaneous textbooks demonstrate that persons skilled in the art would be able to identify

13  specific structures within the class of ion conducting materials.  *See, e,g.,* Ex. D, Granqvist,

14  HANDBOOK OF INORGANIC ELECTROCHROMIC MATERIALS, Chs. 1, 26, 28-30

15  (Elsevier 1995).  Thus, just as the *Linear Tech.* Court held that it was proper to support a means-

16  plus-function term with the "PWM circuit" class of structures, it is proper here to support the

17  "transporting means" term with the "ion conducting materials" class of structures.  The '177

18  Patent's inventors need not have identified every material within that class of structures and

19  should not be limited to those examples they chose to enumerate.

20       Further, one skilled in the art would not have understood the inventors to have limited the

21  corresponding structures to the exact materials described in the specification.  The specification

22  states that "[t]he ion conducting material **may be** a lithium ion conducting material **such as**

23  lithium silicate, lithium borosilicate, lithium aluminum silicate, . . . ."  *Id.* at 2:47-51 (emphasis

24  added).  Similarly, the specification identifies that "[s]uitable materials for forming layer 40 for

25  the transmission of lithium ions **include, for example,** lithium silicate, lithium borosilicate,

26

27  ---

[16] Pulse-width modulation circuits vary the duty cycle in switching devices.
http://en.wikipedia.org/wiki/Pulse-width_modulation (last visited on Oct. 29, 2013); *see also*
28  *Linear Tech.*, 379 F.3d at 1316.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1  lithium aluminum silicate, . . . ."  *Id.* at 6:24-28 (emphasis added).  It also states that "the ion

2  conducing material **may be** a hydrogen ion conducting material **such as** silicon dioxide or

3  tantalum pentoxide."  *Id.* at 2:51-53.  Similarly, it states that "suitable materials for transmitting

4  hydrogen ions **include** tantalum pentoxide and silicon dioxide."  *Id.* at 6:28-29.  The parent patent

5  to the '177 Patent also identifies additional examples of ion conducting materials.  Ex. E, U.S.

6  Patent No. 5,321,544 at 6:18-22 ("'544 Patent"); *see also* '177 Patent at 1:4-7 (identifying the

7  '544 Patent as its parent).  Thus, the materials listed in the '177 Patent are exemplary, not

8  exhaustive.

9      View's proposed structure is also improper because it excludes equivalents.  A proper

10  construction of a § 112(f) term must include equivalent structures in its literal scope.  *Micro*

11  *Chem.*, 194 F.3d at 1258 ("A means-plus-function claim encompasses all structure in the

12  specification corresponding to that element and equivalent structures.").  Because an accused

13  product having a structure that is equivalent, but not identical, to the § 112(f) structure described

14  in the patent will nevertheless literally infringe, the structure should not be narrowly construed to

15  restrict coverage "solely to those means expressly disclosed in the specification."  *Keithley*, 2007

16  U.S. Dist. LEXIS 71126, at *39 (citations omitted).  View's proposed construction, which

17  excludes equivalent structures that would literally infringe, should be rejected.[17]

18          **2.      The "transporting means" need not be "a layer."**

19      There is no dispute that the "transporting means" of claims 17 and 19 explicitly recites

20  that it "consist[s] of only a single layer."  The dispute is whether the "transporting means" of

21

22  _____

[17] If the Court disagrees with SAGE and limits the claimed structure to those compounds
23  explicitly listed in the specification, then the Court should include in the list of materials lithium
based inorganic films, solid, and inorganic electrolytes.  Support for this structure is provided in
24  the specification of the parent of the '177 Patent.  Structure for a § 112(f) element is properly
found in a parent specification.  *See NTP, Inc. v. Research in Motion, Ltd.* 418 F.3d 1282 (Fed.
25  Cir. 2005) (stating that claims should be construed consistently among related patents); *Microsoft*
*Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (stating that statements made
26  in the prosecution of one patent are relevant to the scope of related patents); *Laitram Corp. v.*
*Morehouse Indus., Inc.,* 143 F.3d 1456, 1460 & n.2 (Fed. Cir. 1998) (stating that related patents'
27  prosecution histories inform on each other).  The '544 Patent describes ion conductor layers that
28  are lithium based inorganic films, solid, and inorganic electrolytes.  '544 Patent at 6:18-22.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

claims 4, 6, 12, and 13, which do not have that explicit requirement, must nevertheless also be limited to "a layer."  The answer is no.

The claims themselves belie View's improperly narrow construction.  Claim differentiation is a proper tool in construing the structure corresponding to a claimed function for a § 112(f) term.  *Wenger*, 239 F.3d at 1233-1234 (holding an "air circulating means" is not limited to structures that recirculate air because another claim recited a means for recirculating).  Although claims 17 and 19 recite that the transmitting means consists of a single layer, the other claims do not have such a requirement.  Claim differentiation, then, indicates that the transporting means can be something other than single layer of materials.  Thus, the transmitting means of claims 4, 6, 12, and 13 are not limited to "a layer," as View suggests.

The specification also does not support View's narrowing of "transporting means" to be limited to "a layer."  First, the specification explicitly contemplates transporting means that are more than a layer: "The transporting means desirably includes **at least one layer** formed from an ion conducting material."  '177 Patent at 2:39-40 (emphasis added).  The specification thus contradicts View's proposal limiting the transporting means to "a layer."  Second, the inventors did not define "transporting means" to be one layer, nor did they disavow the scope of structures that are not one layer.  Absent explicit redefinition or disavowal, the claims should not be so limited.  *Thorner*, 669 F.3d at 1365.  The structure used in an embodiment does not limit a § 112 (f) term.  *Wenger*, 239 F.3d at 1233; *Micro Chem.*, 194 F.3d at 1258.  SAGE's proposal, on the other hand, is consistent with the claims and the specification.  SAGE proposes that the transmitting means is made from one or more ion conducting materials.

**C.      "enhancing means"[18]**

| Joint Proposed Construction |
| --- |
| The Parties agree that this term should be construed pursuant to 35 U.S.C. ¶ 112(f).  The parties also agree what the function is.  The parties disagree as to the corresponding structure.<br><br>Function (agreed): enhancing the transmission of radiation through said at least one of said |

---

[18] This term appears in asserted claims 4, 6, 12, 13, 17, and 19 of the '177 Patent.

electrically conductive layers.

| SAGE's Proposed Structure | View's Proposed Structure |
|---|---|
| Structure: at least one optically transparent material, such as transparent oxides, transparent nitrides, or combinations thereof,[19] having an appropriate index of refraction, and their equivalents.[20] | Structure: one or more layers made of transparent oxides, transparent nitrides, a combination of transparent oxides and transparent nitrides, or a mixture of oxides of silicon and tin in any of the following layer configurations:<br><br>(1) a single layer adjacent to one of the conductive layers with an index of refraction that is about equal to the geometric mean of the indices of refraction of the substrate/superstrate and the conductive layer,<br>(2) a two-layer stack where a first layer is adjacent to one of the conductive layers and has an index of refraction that is significantly smaller than the index of refraction of the conductive layer and a second layer that is adjacent the substrate and has an index of refraction that is significantly larger than the index of refraction of the first layer,<br>(3) two or more layers between the substrate and one of the conductive layers wherein the indices of refraction of each layer gradually increase from the index of refraction of the substrate to the index of refraction of the conducting layer, or<br>(4) one layer having an index of refraction greater than 1.9 in surface contact with one of the conductive layers or adhered to the conductive layer, wherein the conductive layer consists of a conductive metal. |

---

[19] The parties agree that the structure should at least include these materials, as described at col. 2, lines 34-38 and col. 9, lines 48-52 of the '177 Patent.

[20] SAGE has corrected grammatical ambiguities in its construction, as compared to that which appears in the parties' Joint Claim Construction and Prehearing Statement in Accordance with Patent Local Rule 4-3. (D. 90)

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    Again, the parties (1) agree that this term is governed by § 112(f) and (2) agree upon the

2    associated function of this term.[21]   The parties' disputes are similar to those for "transporting

3    means."  That is, (1) whether the structure is limited to the exemplary configurations in the

4    specification; (2) whether the structure should be limited to the preferred materials disclosed in

5    the specification; and (3) whether the structure must be comprised of one or more layers.

6               **1.      The "enhancing means" is not limited to the disclosed configurations.**

7    The science underlying this "enhancing means" term – and the inventions of the '177

8    Patent – relates to controlling the refraction and reflection of light.  The refractive index of a

9    material is a measure of how radiation, such as light, travels through the material.  Every material

10   has an inherent refractive index.  When light transitions from one material to another, its

11   transmission path may be affected, resulting in optical interference.  *See, e.g., id.* at 8:25-33; 9:59-

12   64.  The refractive index of the materials dictates the behavior of light at this interface.  *Id.*  By

13   using a desired refractive index to guide the selection of a material at an interface, optical

14   interference can be minimized.  *Id.*

15   As before, the pertinent question is what one skilled in the art would understand to be the

16   structure necessary to perform the claimed function.  *Wenger*, 239 F.3d at 1233; *Micro Chem.*,

17   194 F.3d at 1258; *Tristrata*, 2013 U.S. Dist. LEXIS 149152, at *39.  The specification makes

18   clear that the necessary corresponding structure for "enhancing means" is at least one optically

19   transparent material having an appropriate index of refraction and its equivalents.  The

20   specification states that "the enhancing means comprises at least one layer of an optically

21   transparent material."  '177 Patent at 2:31-32.  The specification describes basing the selection of

22   an optically transparent material on a desired index of refraction.  *See, e.g., id.* at 9:47-64.  For

23   example, if using a mixture of oxides of silicon and tin, "a higher silicon to tin ratio lower[s] the

24   index of refraction and a lower silicon to tin ratio increase[s] the index of refraction."  *Id.*  In this

25

26

27   [21] The phrase "means for" is presumed to invoke § 112(f), and the claims function is signaled by
     the preposition "for": "enhancing the transmission of radiation through said at least one of said
28   electrically conductive layers."

manner, an appropriate index of refraction of an optically transparent material can be chosen with respect to the layers surrounding the material to achieve the claimed function.

Because the selection of an appropriate refractive index and enhancing means configuration depends on the refractive indices of surrounding layers, the specification provides a number of examples of selecting an appropriate refractive index for the optically transparent material. *See, e.g.*, '177 Patent at 2:59-3:4, 3:10-27, 2:28-47, 3:60-66, 4:13-16, 7:44-8:36, 8:42-9:64, 10:59-11:49, 11:66-12:19, 12:40-64, 13:28-53, Figs. 3, 4, 6, 8, 10, 11. The specification even provides transmission analyses for some of these possibilities. *Id.* at 10:40-58, 11:27-49, 12:50-64, Figs. 5, 7, 9.

In one of these embodiments, shown below on the left, a substrate has a first refractive index ($n_1$), an optically transparent material in surface contact with the substrate has a third refractive index ($n_3$), and an electrically conductive layer has a second refractive index ($n_2$). '177 Patent at col. 2:59-67. In this described embodiment, the optically transparent material is selected such that $n_3$ is between $n_1$ and $n_2$. *Id.* In a preferred embodiment, $n_3 = \sqrt[2]{n_1 * n_2}$ . *Id.* at 2:67-3:4.



Another embodiment, shown above on the right, contemplates a number, n, of optically transparent materials. *Id.* at 3:10:27. A first optically transparent material is in contact with an electrically conductive material, and the $n^{th}$ optically transparent material is in contact with a substrate. *Id.* The electrically conductive layer has a first refractive index ($n_1$), and the substrate

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1  has a second refractive index ($n_2$) less than the first. *Id.* In this embodiment, the optically

2  transparent materials are selected such that $n_1 < n_3 < n_4 < n_5 < \ldots < n_n < n_2$ .

3      In yet another example, when the enhancing means is selected to have a refractive index

4  substantially the same as or greater than that of a counterelectrode, such that an electrically

5  conductive layer having a lower index of refraction is sandwiched between those two layers, "the

6  reflected signals [e.g. light] at the various interfaces between [the layers of the device] will be

7  reduced, thereby lowering reflection and maximizing transmission." '177 Patent at 8:25-36.

8      One skilled in the art reading the specification, including the numerous examples in the

9  '177 Patent, would understand that the structure necessary to perform the claimed function is one

10  or more optically transparent materials having an appropriate refractive index. For example, U.S.

11  Patent Nos. 4,187,336 and 4,308,316 ("the Gordon References"), incorporated by reference in the

12  '177 Patent, describe the knowledge of persons of skill in the art relating to selecting materials

13  with appropriate refractive indices. *Id.* at 9:56-59. They describe the science and theory for

14  choosing a refractive index to enhance optical transmission. Ex. F, U.S. Patent No. 4,187,336 at

15  5:24-6:55 ("Gordon '336 Patent"); Ex. G, U.S Patent No. 4,308,316 at 5:26-6:50 ("Gordon '316

16  Patent"). They also include tables of materials sorted by their refractive indices to aid in the

17  selection of an optically transparent material having an appropriate index of refraction. Gordon

18  '336 Patent at 6:57-8:25; Gordon '316 Patent at 6:52-8:22. The Gordon References demonstrate

19  that one skilled in the art reading the '177 Patent would understand that the class of structures for

20  performing the claimed function is optically transparent materials having an appropriate index of

21  refraction, selected according to well-known principles and dependent on the refractive indices of

22  the surrounding materials.

23      The facts here are again analogous to *Linear Tech.* There, the district court held that a

24  specific structure was required. *Id.* at 1321-22. The Federal Circuit reversed, holding that all that

25  is required is the disclosure of a class of structures that persons skilled in the art would understand

26  perform the claimed function. *Id.* at 1322. The Federal Circuit relied on the knowledge of those

27  skilled in the art – evidenced by technical textbooks – to conclude that the disclosed class of

28  structures was identifiable by persons skilled in the art. *Id.* Here, the specification discloses that

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   the "enhancing means" is one or more optically transparent materials ('177 Patent at 2:31-32) and

2   discloses that that material should be chosen to have an appropriate refractive index, both

3   explicitly (*see, e.g., id.* at 8:25-33; 9:59-64) and by way of example (*see, e.g., id.* at 2:59-3:4,

4   3:10-27, 2:28-47, 3:60-66, 4:13-16, 7:44-8:36, 8:42-9:64, 10:59-11:49, 11:66-12:19, 12:40-64,

5   13:28-53, Figs. 3, 4, 6, 8, 10, 11).  Like the textbooks in *Linear Tech.*, the Gordon References

6   establish that this class of structures was identifiable by persons skilled in the art.  Accordingly,

7   the corresponding structure necessary to perform the claimed function should be the identifiable

8   class of "one or more materials . . . having an appropriate index of refraction, and their

9   equivalents."

10      View seeks improperly to limit the literal scope of the "enhancing means" to certain of the

11   disclosed embodiments.  View's construction excludes disclosed embodiments of "enhancing

12   means."  For example, the '177 Patent contemplates a configuration where "optical tuning layer

13   62 **preferably** is formed from a transparent material having an index of refraction which is equal

14   to the geometric mean of the indices of refraction of conductive oxide layer 22 and **laminate**

15   **layer 70**."  '177 Patent at 9:13-17 (emphasis added).  None of the configurations in View's

16   proposed construction contemplate an enhancing means selected to have a refractive index

17   calculated based on that of a laminate layer.  When multiple embodiments are disclosed, a more

18   general structure should apply that embraces all of them.  *Micro Chem.*, 194 F.3d at 1258; *see*

19   *also Vitronics*, 90 F.3d 1583 (stating that a construction excluding an embodiment is "rarely, if

20   ever, correct").  In *Micro Chem.*, the district court construed the structure corresponding to the

21   "weighing means" to be the cumulative weigh structure of the preferred embodiment.  194 F.3d at

22   1258.  The specification, however, "discloses several alternative embodiments of the invention,

23   each having a different type of weighing means."  *Id.* at 1259.  The Federal Circuit reversed,

24   construing the structure to more generally include all disclosed embodiments.  *Id.* at 1258-59.

25   Like in *Micro Chem.*, the '177 Patent discloses several alternative embodiments of an enhancing

26   means.  It would be improper to limit the claims in a manner that excludes any one of these

27   structures.

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   Even if View's proposed construction includes every contemplated structure disclosed in

2   the '177 Patent, limiting the scope of the claims to those examples would be improper.  As stated

3   above, § 112(f) is intended to preclude such "an overly narrow construction that would restrict

4   coverage solely to those means expressly disclosed in the specification."  *Keithley*, 2007 U.S.

5   Dist. LEXIS 71126, at *39.  Instead, the corresponding structure should, at a minimum,

6   contemplate in its literal scope equivalent structures that perform the claimed function.  *Id.*  The

7   structure should not be limited to disclosed embodiments.  *Wenger*, 239 F.3d at 1233; *Micro*

8   *Chem.*, 194 F.3d at 1258.

9   **2.   The "enhancing means" is not limited by its material composition.**

10   View's proposal also improperly limits the corresponding structure to certain materials.

11   View's proposal limiting the structure to select materials unnecessarily excludes other materials

12   with appropriate refractive indices that perform the claimed function.  The corresponding

13   structure is only that which is necessary to perform the claimed function.  *Wenger*, 239 F.3d at

14   1233; *Micro Chem.*, 194 F.3d at 1258.  As stated above, the selection of the optically transparent

15   material is not related to what the material is composed of, but, rather, it is selected based on its

16   refractive index.  *See, e.g.,* '177 Patent at 2:59-3:4; 3:10-27; 3:38-47; 3:60-4:2.  As one skilled in

17   the art would recognize, any number of materials could be used once an appropriate index of

18   refraction is identified.  *See, e.g.,* Gordon '336 Patent at 6:57-8:25 (listing materials by their

19   refractive indices).  The particular material is an unnecessary limitation on the structure.

20   Also, as with "transporting means," one skilled in the art would understand the

21   specification to be listing non-exhaustive examples of materials that can be used as an enhancing

22   means.  Structure corresponding to a claimed function should not be limited to preferred

23   embodiments.  *Wenger*, 239 F.3d at 1233; *Micro Chem.*, 194 F.3d at 1258.  The specification

24   identifies "[p]referred materials" or "[p]articularly preferred" materials that may serve as an

25   "enhancing means."  '177 Patent at 9:48-52; *see also* '177 Patent at 2:34-48.  Indeed, the

26   specification directs one skilled in the art to the Gordon references that disclose "[o]ther materials

27   which can be used."  *Id.* at 9:56-69.  The inventors explicitly incorporated the Gordon references

28   into their specification to direct one skilled in the art to other potential structures.  *Id.*  Therefore,

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    one skilled in the art would have understood that materials other than "transparent oxides,

2    transparent nitrides, a combination of transparent oxides and transparent nitrides, or a mixture of

3    oxides of silicon and tin" are candidates to be the claimed structure for "enhancing means."

### 3.    The "enhancing means" need not be comprised of layers.

5    The claimed structure should not be limited to layers.  First, an enhancing means made of

6    layers is only a preferred embodiment.  The specification states that "**[i]n preferred**

7    **embodiments**, the enhancing means comprises at least one layer of an optically transparent

8    material in surface contact with the at least one electrically conductive layer." '177 Patent at

9    2:31-34.  The claims should not be limited to preferred embodiments.  *Wenger*, 239 F.3d at 1233;

10   *Micro Chem.*, 194 F.3d at 1258.  Instead, the structure corresponding to the "enhancing means"

11   should more broadly refer to one or more optically transparent materials whose refractive indices

12   are appropriately selected.  View's proposal limiting the term to this preferred embodiment

13   should be rejected.

### D.    "superstrate"[22]

| SAGE's Proposed Construction | View's Proposed Construction |
|---|---|
| a layer of material that provides support and protection | a glass, ceramic, or plastic layer in surface contact with or adhered to the electrochromic device |

18   Generally speaking, a superstrate is located opposite the substrate, on the other side of the

19   electrochromic device.  The parties dispute (1) whether the claimed superstrate must be glass,

20   ceramic, or plastic, and (2) whether the superstrate need only support and protect the

21   electrochromic device or whether it must also be in surface contact with or adhered to the

22   electrochromic device.

23   The term "superstrate" is generally used in three ways in the claims.  In each instance, the

24   "superstrate" is described as "cooperating with [a] substrate to sandwich said electrochromic

25   device." '177 Patent at 14:41-43, 15:41-42, 16:21-22, 17:4-14.  In claim 1, this "superstrate" is

26   also said to be in surface contact with the electrochromic device.  *Id.* at 14:54-50.  In claims 2 and

---

[22] This term appears in asserted claims 6, 13, 14, and 16 of the '177 Patent.

11, an optically transparent layer is described as being "interposed between said superstrate and [an] electrically conductive layer[]." *Id.* at 14:54-56; 16:25-27.

None of these uses supports View's proposal limiting a superstrate material or requiring surface contact/adhesion. First, there is no mention of "glass, ceramic, or plastic" in the claims. Second, only in claim 1 is the superstrate described as being in surface contact with the substrate. Because none of the other claims have this requirement, the doctrine of claim differentiation indicates that surface contact is not required. *See Phillips*, 415 F.3d at 1314-15 (describing claim differentiation). Instead, the claims support SAGE's construction. The cooperation of a superstrate with a substrate is designed to "provide[] support and protection" to the electrochromic device.

The specification also does not support View's narrow construction. First, a superstrate made of glass, ceramic, or plastic is a preferred, non-limiting embodiment. Barring an explicit definition by the inventors or their express disavowal of claim scope, a court should not import limitations into the specification. *Thorner*, 669 at 1365-66. The specification states that a superstrate may be made of any number of materials, including glass, ceramic, or plastic. '177 Patent at 13:60-65. (Although the described embodiments had a glass superstrate, "other substrate and superstrate materials may be used, including transparent ceramic materials and rigid and flexible transparent plastics."). By no means did the inventors redefine the term or otherwise disavow a superstrate made of materials other than glass, ceramic or plastic. Instead, the inventors made clear that other materials may be used.

Second, the inventors described that, like a substrate, a superstrate "provides further support and protection" to the layers of the electrochromic device. '177 Patent at 13:54-60. SAGE's proposal stems from this definitional statement. The specification, however, does not mandate that a superstrate be in surface contact or adhered to an electrochromic device. *Id.*; *see also id.* at 8:4-5. Instead, surface contact or adhesion is one embodiment of a superstrate. *See, e.g., id.* at 4:37-39 ("A layer of an adhesive material **may be used** . . . " (emphasis added)). None of View's cited intrinsic evidence amounts to a definition or disavowal limiting a superstrate to be

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

in surface contact with or adhered to the electrochromic device. *Thorner*, 669 at 1365-66.

Accordingly, View's proposal should be rejected.

## V.     SAGE'S '610 PATENT

### A.     Claims of the '610 Patent

The inventions claimed in the '610 Patent also generally adhere to the "sandwich"

structure described in Section II.  Claim 1 is representative:

> 1. A heat treated electrochromic device comprising:
> a) a **first electrode** comprising one of a cathodic electrochromic layer or an anodic
>    counter electrode layer,
> b) a **second electrode** comprising the other of said cathodic electrochromic layer
>    or said anodic counter electrode layer,
> c) an **ion-conductor layer** for conducting ions between said first and second
>    electrodes,
> d) a **first conductive layer**, and
> e) a **second conductive layer**,
> said first and second electrodes and said ion-conductor layer being **sandwiched**
>    between said first and second conductive layers,
> said anodic counter electrode layer comprising lithium and a mixed tungsten-
>    nickel oxide substantially in crystalline form, and
> wherein the amount of nickel in said mixed tungsten-nickel oxide ranges from
>    15% to 90% by weight of said mixed tungsten-nickel oxide.

'610 Patent at 11:58-12:9 (emphasis added).  Among other things, the inventions of the '610

Patent specifically require that the electrochromic device be "heat treated" and that the "anodic

counter electrode layer" includes "a mixed tungsten-nickel oxide substantially in crystalline

form."   These aspects of the claimed inventions provide benefits to electrochromic devices. *See*

'610 Patent at 2:28-34, 7:56-8:29, 8:63-9:4, 10:58-11:23.  The meanings of these terms are not in

dispute.  The parties only dispute is the meaning of "ion-conductor [-ing] layer".  This term

generally corresponds to the ion conducting material described in Section II through which ions

flow from the counterelectrode to the electrochromic electrode.

### B.     "ion-conductor [-ing] layer"[23]

| SAGE's Proposed Construction | View's Proposed Construction |
|---|---|
| one or more materials that conduct ions between the first and second electrodes | deposited material that conducts ions between the first and second electrodes while blocking electronic current |

---

[23] This term appears in asserted claims 1, 18, and 20 of the '610 Patent.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    The parties dispute (1) whether the ion conducting material must be deposited, and (2)

2    whether the ion conducting layer must block electronic current.

3    **1.    The ion conductor layer need not be "deposited"**

4    The ion conductor layer need not be "deposited" because the method of creating a device

5    should not be imported into a device claim, and because depositing an ion conductor layer is a

6    non-limiting, preferred embodiment.

7    First, the claims are directed to a device, not the method of creating that device.  View's

8    attempt to import the method of creating one of the device's layers – a deposition method – is

9    improper.  The Federal Circuit's *Vanguard Prods. Corp. v. Parker Hannifin Corp.* decision is

10   instructive.  234 F.3d 1370.  The claims in *Vanguard* related to a gasket having an inner layer and

11   an outer layer "integral therewith."  *Id.* at 1371.  The issue was whether "integral therewith"

12   required that the product be made by a process known as co-extrusion.  *Id.*  The defendant

13   manufactured the accused product using dip coating, not co-extrusion.  *Id.*  Among other things,

14   the defendant "argue[d] that 'integral therewith' requires the use of co-extrusion to manufacture

15   the gasket [because it is] the only process shown in the specification."  *Id.*  The Federal Circuit

16   held that "integral" describes the product – not the manufacturing process.  *Id.* at 1372.  Even

17   though the inventors "extolled the economy of manufacture and superior product made by co-

18   extrusion," "[t]he method of manufacture, even when cited as advantageous, does not of itself

19   convert product claims into claims limited to a particular process."  *Id.* at 1372.  "A novel product

20   . . . is not limited to the process by which it was made."  *Id.*; *see also AstraZeneca Pharms. LP v.*

21   *Teva Pharms. USA, Inc. (In re Rosuvastatin Calcium Patent Litig.)*, No. 08-1949 et al., 2009 U.S.

22   Dist. LEXIS 37649, at *23 (D. Del. 2009) (rejecting construction that imported a process for

23   creating "salts" because it "impermissibly [read] into the claim a process limitation that was not

24   recited by the patentee.").

25   Here, the claims are also directed to a product – an electrochromic device.  The element at

26   issue is the "ion conductor layer" or "ion conducting layer."  This element is a structural part of

27   the claimed device.  Like the layer in *Vanguard*, these layers are not limited by the disclosed

28   process(es) for manufacturing them.  Thus, although the specification discloses a deposition

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1 method of manufacturing the ion conductor [-ing] layers, the claims are not limited to layers

2 made this way.

3       In fact, the '177 Patent specification distinguishes between the disclosed device and

4 method.  In contrast to the disclosed electrochromic device, which includes an ion conductor

5 layer ('610 Patent at 2:58-62), the specification describes "a method [that] has also been

6 discovered for preparing an eletrochromic device [including] depositing an ion-conductor layer"

7 (*Id.* at 3:34-48).  One skilled in the art would not understand the inventors to have re-defined or

8 disavowed devices with an ion-conductor layer created without deposition.  *See Thorner*, 669

9 F.3d at 1365.  For example, SAGE's U.S. Patent No. 5,699,192, cited by View for support for its

10 proposal, indicates that there are a number of "film formation" methods and that the ion-

11 conductor layer "[can be] applied" in a number of ways.  Ex. H, U.S. Patent No. 5,699,192 at

12 2:53-56, 4:46-5:8, 5:34.  This extrinsic evidence shows that persons of skill in the art knew that

13 an ion-conductor layer may be formed in any number of ways.[24]

14       Second, "depositing" materials to create an ion conducting layer is a non-limiting

15 embodiment.  The specification discloses a number of methods of depositing an ion conductor

16 layer.  '610 Patent at 9:54-62.  The specification does not limit the claimed ion conductor layer to

17 be created by deposition.  Instead, the specification makes clear to one skilled in the art that other

18 ways of creating an ion conductor layer "may be devised without departing from the spirit and

19 scope of the present invention."  *See id.* at 11:46-54.  Statements like these indicate to one skilled

20 in the art that the disclosed embodiments are non-limiting.  *Network Appliance, Inc. v. Sun*

21 *Microsystems, Inc.*, No. 07-06053-EDL, 2008 U.S. Dist. LEXIS 76713, at *44-45 (N.D. Cal.

22 2008) (noting that the final paragraph of the patent specification "confirms that the invention may

23 be implemented in alternate forms" and that "the specification and the plain language of the

24 claims demonstrate that the inventor contemplated requiring the system interface architecture in

25 only one of the three independent claims.").

26

27 _____

[24] Although SAGE questions whether any material may be applied or formed without deposition,
by virtue of View's attempt to read the term "deposition" into the claims, the specification refutes

28 that the claims are limited to any one method of forming an ion-conductor layer.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1

    **2.**    **The ion-conductor[-ing] layer need not entirely block electric current.**

2

    An ion conducting layer that blocks electronic current is also a non-limiting embodiment.

3 "**Preferably**, the ion conductive layer 32 has low or no electronic conductivity." '610 Patent at

4 7:30-31 (emphasis added).  One skilled in the art would recognize that an ion-conductor layer that

5 blocks electric current is a preferred embodiment, not a limiting embodiment.  Barring an express

6 definition or disavowal, the claims should not be limited to a preferred embodiment.  *Thorner*,

7 669 at 1365-66.  In fact, one skilled in the art would understand that the claimed ion conducting

8 layer may have low electronic conductivity, *i.e.*, it does not block all current.  '610 Patent at 7:30-

9 31 (describing an embodiment where "the ion conductive layer 32 has low . . . electronic

10 conductivity.").    View's construction would read this embodiment out of the claims.

11     The **only** instance where "blocking electronic current" is described in the specification is

12 with regard to the ion conductor layer of Figure 3.  '610 Patent at 5:60-62.  Figure 3, however, "is

13 a schematic cross-section of a five layer electrochromic device **in accordance with one**

14 **embodiment of the current invention.**" '610 Patent at 4:46-48 (emphasis added).  The mere

15 presence of one embodiment of the invention is not a basis to narrow the claims to that

16 embodiment.  *Thorner*, 669 at 1365-66.

17 **VI.**    **CONCLUSION**

18     For the reasons discussed above, the Court should adopt SAGE's proposed constructions

19 for the SAGE Patents and deny View's proposals.

20

21 Dated: November 21, 2013           McDERMOTT WILL & EMERY LLP

22

23     By:*/s/ Terry W. Ahearn*
        Terrence P. McMahon

24         Terry W. Ahearn
        Sarah Chapin Columbia (*pro hac vice*)

25         Leigh Martinson (*pro hac vice*)
        Hasan Rashid (*pro hac vice*)

26

27         Attorneys for Plaintiff and Counterclaim
        Defendant
        SAGE ELECTROCHROMICS, INC.

28