UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAGE ELECTROCHROMICS, INC., <br>     Plaintiff, <br>   v. <br> VIEW, INC., <br>     Defendant. | Case No. 12-cv-06441-JST <br><br> **CLAIM CONSTRUCTION ORDER** <br> Re: ECF Nos. 202, 203, 208, 209, 210, 211 |

The parties have requested that the Court construe disputed terms in the claims of United States Patent Nos. 6,337,758 ("the '758 patent"), 7,193,763 ("the '763 patent"), 5,830,336 ("the '336 patent"), 6,039,850 ("the '850 patent"), and 8,749,870 ("the '870 patent"). Now, after consideration of the arguments and evidence presented by the parties, and the relevant portions of the record, the Court construes the terms as set forth below.[1]

**II.  BACKGROUND**

    **A.  Procedural History**

Plaintiff SAGE Electrochromics, Inc. ("SAGE") filed this action in December 2012, alleging that Defendant View, Inc. (View") infringed SAGE's United State Patents Nos. 5,724,177 ("'177 patent") and 7,372,610 ("'610 patent"). ECF No. 1. Both companies design and manufacture electrochromic glass technology used in windows and are direct competitors in the market. Id. at ¶¶ 13, 22; ECF No. 200 at 19. Electrochromic glass, also known as dynamic glass,

---

[1] The Court has concluded that a claim construction hearing regarding these terms is unnecessary and, accordingly, has decided their meaning based on the written record. See Ballard Med. Products v. Allegiance Healthcare Corp., 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("Markman does not require a district court to follow any particular procedure in conducting claim construction. It merely holds that claim construction is the province of the court, not a jury. To perform that task, some courts have found it useful to hold hearings and issue orders comprehensively construing the claims in issue. Such a procedure is not always necessary, however.")

1    can change between clear and tinted states by means of electric charges.  ECF No. 1 ¶ 13.

2        In February 2013, View filed its answer and asserted several counterclaims, alleging that

3    SAGE infringed View's United States Patent No. 8,243,357 (the "'357 patent") and seeking

4    declaratory judgment on the '177 and '610 patents.  ECF No. 29 ¶¶ 12-37.  In May 2013, View

5    amended its answer and counterclaims, alleging that SAGE also infringed View's United States

6    Patents Nos. 5,831,851 (the "'851 patent") and 8,432,603 (the "'603 patent").  ECF No. 58.

7        On April 11, 2014, SAGE filed a First Amended Complaint ("FAC"), alleging View also

8    infringed four other SAGE patents – the '758 patent, '763 patent, '336 patent, and the '850 patent.

9    ECF No. 161 ¶¶ 13-76.  On July 10, 2014, View filed its answer to the FAC and a new

10   Counterclaim, alleging that SAGE infringed View's '850 patent.  ECF No. 184.

### B. Legal Standard

12       The construction of terms found in patent claims is a question of law to be determined by

13   the Court.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc),

14   aff'd, 517 U.S. 370 (1996).  "[T]he interpretation to be given a term can only be determined and

15   confirmed with a full understanding of what the inventors actually invented and intended to

16   envelop with the claim." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting

17   Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

18   Consequently, courts construe claims in the manner that "most naturally aligns with the patent's

19   description of the invention."  Id.

20       The first step in claim construction is to look to the language of the claims themselves.  "It

21   is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the

22   patentee is entitled the right to exclude.'" Phillips, 415 F.3d at 1312 (quoting Innova/Pure Water,

23   Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  A disputed claim

24   term should be construed in light of its "ordinary and customary meaning," which is "the meaning

25   that the term would have to a person of ordinary skill in the art in question at the time of the

26   invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1312.

27   In some cases, the ordinary meaning of a disputed term to a person of skill in the art is readily

28   apparent, and claim construction involves "little more than the application of the widely accepted

1  meaning of commonly understood words." Id. at 1314.  Claim construction may deviate from the
2  ordinary and customary meaning of a disputed term only if (1) a patentee sets out a definition and
3  acts as his own lexicographer, or (2) the patentee disavows the full scope of a claim term either in
4  the specification or during prosecution.  Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d
5  1362, 1365 (Fed. Cir. 2012).

6  Ordinary and customary meaning is not the same as a dictionary definition.  "Properly
7  viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading
8  the entire patent.  Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks
9  transforming the meaning of the claim term to the artisan into the meaning of the term in the
10 abstract, out of its particular context, which is the specification." Id. at 1321.  Typically, the
11 specification "is the single best guide to the meaning of a disputed term." Vitronics Corp. v.
12 Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  It is therefore "entirely appropriate for a
13 court, when conducting claim construction, to rely heavily on the written description for guidance
14 as to the meaning of claims." Phillips, 415 F.3d at 1315.  However, while the specification may
15 describe a preferred embodiment, the claims are not necessarily limited only to that embodiment.
16 Id.

17 Finally, courts may consider extrinsic evidence in construing claims, such as "expert and
18 inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980.  Expert
19 testimony may be useful to "provide background on the technology at issue, to explain how an
20 invention works, to ensure that the court's understanding of the technical aspects of the patent is
21 consistent with that of a person of skill in the art, or to establish that a particular term in the patent
22 or the prior art has a particular meaning in the pertinent field." Phillips, 415 F.3d at 1318.
23 However, extrinsic evidence is "less reliable than the patent and its prosecution history in
24 determining how to read claim terms." Id.  If intrinsic evidence mandates the definition of a term
25 that is at odds with extrinsic evidence, courts must defer to the definition supplied by the former.
26 Id.

27 **C.  Jurisdiction**
28 Since this is an action "relating to patents," the Court has jurisdiction pursuant to U.S.C.

1  § 1338(a).

2  **III.   ANALYSIS**

3  **A.    The '758 Patent**

4  The parties dispute the meaning of two terms of SAGE's '758 patent.

5  **1.    "Closed line" (claim 1)**

| Disputed Claim Term | SAGE's Proposed Construction | View's Proposed Construction |
|---|---|---|
| Closed line | A single line around an area, dividing from an area outside the line on all sides of the same layer. | A single line around an area, separating the area from the inactive region outside the line on all sides of the same layer. |

The parties agree that the term closed line refers to "a single line around an area" that divides or separates that area from a region or area "outside the line on all sides of the same layer."

The parties' dispute concerning the term "closed line" centers on whether the term's construction should indicate that line separates the area in question from an "inactive region" outside of the line.  View asserts that the construction should state that the area outside of the closed line is an "inactive region," as the rest of Claim 1 makes clear that the purpose of the line is to "delimit an inactive region of the stack that is located between the closed line and an edge of the stack so as to delimit an inactive peripheral region in the stack."  '758 Patent at 10:14-16.  SAGE argues that, because the surrounding claim language discusses the inactive peripheral region, there is no need to define the term "closed line" in reference to the peripheral inactive region, as such a construction would create confusion by duplicating the surrounding claim language.  SAGE also argues that this would impermissibly introduce an additional claim limitation.

The Court concludes it is unnecessary to include language in the term's construction indicating that the closed line separates the area included in the line from an "inactive region outside the line."  Immediately following the use of the term "closed line" in the claim, the claim makes clear that the line's purpose is "to delimit an inactive region of the stack that is located between the closed line and an edge of the stack so as to delimit an inactive peripheral region in

4

the stack." Id. at 10:14-18.  Although construing the term "closed line" to make reference to the peripheral "inactive region" would not, as SAGE argues, impermissibly add a limitation not already found elsewhere within the claim, it would be unnecessarily duplicative in light of the surrounding claim language.

The Court therefore adopts SAGE's proposed construction.

### 2. "Cutting through the at least one of the layers along a closed line" (claim 1)

| Disputed Claim Term | SAGE's Proposed Construction | View's Proposed Construction |
|---|---|---|
| Cutting through the at least one of the layers along a closed line | A cut through at least one layer forming a single line around an area, dividing it from an area outside the line on all sides of the layer | Cutting through the at least one of the functional layers, with the exception of one of the two electro-conductive layers, in a single line around an area, separating the area from the inactive region outside the line on all sides on the same layer |

The parties dispute whether the "closed line" of claim 1 can cut through every layer of the device including the two electroconductive layers.  SAGE urges a construction that would allow for the closed line to cut through both of the electroconductive layers, whereas View argues that the construction should indicate that "the cutting must leave one of the two electroconductive layers intact."  ECF No. 209 at 6.

SAGE argues that View's reading would rewrite claim 1 in a manner inconsistent with the specification and would exclude all embodiments.  SAGE directs the Court to the specification, which teaches that the purpose of the "inhibition" of the stack is to deactivate the device at its periphery.  '758 Patent at 4:1-5.  The specification indicates that the inhibition of the periphery may be achieved by variants involving either cutting or degrading.  Although the specification makes clear in a parenthetical that the variant consisting of "locally inhibiting the functionality of at least one of the layers of the stack by degrading" is "always with the exception of one of the electroconductive layers," id. at 5:3-7, the specification contains no such caveat regarding the

5

variant consisting of "locally inhibiting the functionality of at least one of the layers by cutting." Id. at 4: 32-36.

SAGE also notes that the specification teaches that the variant consisting of degradation rather than cutting is "preferably carried out not along a closed line, like the cut according to the first variant, but over the entire surface of the peripheral border." Id. at 5:8-11.  Thus, SAGE argues it would be nonsensical to read the specification's limitation pertaining to degrading not along a closed line into the Court's construction of the term "cutting through the at least one of the layers along a closed line."

View maintains that its construction is in fact supported by the specification.  View acknowledges that inhibition may be achieved by either cutting or degrading, but argues that regardless of which variant is used to inhibit the periphery, the specification indicates repeatedly that less than all of the functional layers of the device are inhibited.  Id. at 3:15-20 ("[t]he method of the invention is characterized in that the functionality of at least one of the functional layers, with the exception of one of the electroconductive layers, in particular with the exception of the first (the one closest to the carrier substrate), is locally inhibited so as to delimit and inactive peripheral region in the stack."); id. at 3:62-65 ("Keeping one of the electroconductive layers intact, unaffected by the inhibition process according to the invention, makes it possible to ensure correct supply of electricity to the terminals of the device.").  Because the specification indicates that at least one of the electroconductive layers must remain "unaffected by the inhibition process," View argues that at least one of the electroconductive layers may not be cut *or* degraded.

SAGE responds that although the specification mentions embodiments wherein one of the electroconductive layers remains intact in order "to ensure correct supply of electricity to the terminals of the device," the specification also indicates that "[t]here are a variety of possible ways of maintaining this integrity," including methods other than keeping an electroconductive layer intact.  Id. at 3:62-67.  Thus, although some embodiments include an intact electroconductive layer, SAGE argues this is a practical consideration discussed in the specification rather than a claim limitation.  SAGE does not attempt to explain the specification's statement that "[t]he method of the invention is characterized in that the functionality of at least one of the functional

6

1  layers, **with the exception of one of the electroconductive layers**, in particular with the
2  exception of the first (the one closest to the carrier substrate), is locally inhibited so as to delimit
3  and inactive peripheral region in the stack." Id. at 3:15-20 (emphasis added).  This statement does
4  not discuss an embodiment, but rather ties the method of the invention to the lack of inhibition of
5  one of the electroconductive layers.

6  In addition to its arguments based upon the specification, View argues that its construction
7  better comports with the plain language of the claim.  View asserts that SAGE's construction does
8  not give meaning to the definite article "the" in the phrase "cutting through the at least one of the
9  layers." Id. at 10:13 (emphasis added).  View argues that the use of "the" is meant to hearken
10 back to the preceding clauses, which describe the method as "locally inhibiting a functionality of
11 at least one of the functional layers, with the exception of one of the two electroconductive
12 layers." Id. at 10:11-15.  SAGE responds that this "the" refers to the antecedent of one specific
13 functional layer that is inhibited by cutting, rather than all of the inhibited functional layers.  Thus,
14 SAGE argues that this clause merely indicates that the particular layer in question is not the
15 electroconductive layer, rather than definitively mandating that the electroconductive layer cannot
16 be cut.

17 The Court agrees with View that the best reading of the claim and the specification is that
18 at least one of the electroconductive layers must remain intact – neither cut nor degraded.  The use
19 of the antecedent "the" in the claim term refers back to the preceding clause "at least one of the
20 functional layers, with the exception of one of the two electroconductive layers," indicating that
21 the layers cut through also must except one of the two electroconductive layers. Id. at 10:12-14.
22 This reading is buttressed by the teachings of the specification, in particular the statement that
23 "[t]he method of the invention is characterized in that the functionality of at least one of the
24 functional layers, with the exception of one of the electroconductive layers, in particular with the
25 exception of the first (the one closest to the carrier substrate), is locally inhibited so as to delimit
26 and inactive peripheral region in the stack." Id. at 3:15-20.  This statement does not refer to one
27 particular embodiment, but rather to the method of the invention generally.  Because cutting and
28 degrading are two variants for inhibiting the functionality of the functional layers, it follows that

1  "one of the electroconductive layers" must be excepted from both cutting *and* degrading,

2  remaining intact.

3  Therefore, the Court construes the term "cutting along a closed line" as "cutting through

4  the at least one of the functional layers, with the exception of one of the two electro-conductive

5  layers, in a single line around an area, dividing from an area outside the line on all sides of the

6  same layer."[2]

### B. The '763 Patent

#### 1. "Upper electrode" (claim 1)

| Disputed Claim Term | SAGE's Proposed Construction | View's Proposed Construction |
|---|---|---|
| Upper electrode | The electrode deposited on the other side from the lower electrode with respect to the carrier substrate | The electrode deposited on the other side of the device from the lower electrode |

The parties dispute whether the term should be construed to make clear that the upper electrode is deposited on the other side of the device from the lower electrode "with respect to the carrier substrate."[3]  SAGE argues that its proposed construction of the term "upper electrode" conforms to the specification's provided definition.  The specification states:

> the term "lower" electrode is understood to mean the electrode lying closest to the carrier substrate taken as reference, on which electrode at least some of the active layers (all of the active layers in an all solid state electrochromic system) are deposited.  The "upper" electrode is that deposited on the other side with respect to the same reference substrate.

'763 Patent at 3:22-28.

Although View states that it "agrees with SAGE's new construction as drafted," View's

---

[2] The Court includes its construction of "closed line" with the construction of this term, rather than View's, which would indicate the area outside the closed line is "an inactive region."
[3] View notes that SAGE redrafted its construction of the term on the eve of the filing of its opening brief to obviate a dispute the parties had regarding the term.

8

1  claim construction brief disputes SAGE's argument in its brief that the upper electrode must be
2  "deposited on the same substrate as the lower electrode."  ECF No. 203 at 17.  Because neither
3  party's proffered construction requires the Court to make a conclusion as to whether the upper
4  electrode must be deposited on the same substrate as the lower electrode, the Court declines to
5  do so.
6  The Court agrees that SAGE's proposed construction conforms to the definition of that
7  term provided within the specification.  Therefore, the Court adopts SAGE's construction.

### 2. "Glazing panel" (claim 11)

| Disputed Claim Term | SAGE's Proposed Construction | View's Proposed Construction |
|---|---|---|
| Glazing panel | Glass or other transparent or translucent material fitted on or into a prepared opening such as a window or internal partition | A flat piece of any essentially transparent material made of glass and/or polymer |

The parties' dispute regarding the term "glazing panel" turns on the word "panel," which SAGE urges should be construed to mean an object that is "fitted on or into a prepared opening."[4] View argues the Court should not construe the term to require that the "glazing panel" be "fitted on or into a prepared opening," citing to a dictionary definition of "panel" defining the word to mean a "comparatively thin, flat piece of wood or the like."  Random House Webster's Unabridged Dictionary, Second Edition (2001) at 1401, ECF No. 209-3.

SAGE cites various references to "glazing panels" in the specification, such as references to "glazing panels fitted on the outside of buildings," '763 Patent at 1:23-26, "glazing panels fitted into internal partitions," id. at 1:32-34, and "glazing panels fitted as outside windows."  Id. at 4:10-12.  SAGE asserts that the specification's repeated references to glazing panels being fitted into place supports its proposed construction of the term.

---

[4] The specification defines "glazing," indicating that "[t]he term 'glazing' is to be understood in the broad sense and it encompasses any essentially transparent material, made of glass and/or polymer (such as polycarbonate PC or polymethyl methacrylate PMMA)."  '763 Patent at 5:34-38.

9

1      View argues that these references are merely non-limiting examples of glazing panels, and
2 that "particular embodiments appearing in the written description [should] not be used to limit
3 claim language that has broader effect." Innova/Pure Water, 381 F.3d at 1117. Thus, View
4 maintains that the Court should not import the limitation that the panel must be "fitted on or into a
5 prepared opening" into the term's construction. View notes that the specification contains a list of
6 potential uses of the invention, some of which would not be covered by SAGE's proposed
7 construction. The specification discusses that the invention could be found in applications such as
8 "roofs," "display screens, such as projection screens, television or computer screens, and touch-
9 sensitive screens," "to protect solar panels," or "as energy storage devices of the battery or fuel-
10 cell type, and as batteries and cells themselves." Id. at 43-55.

11      The Court agrees with View that SAGE's proposed construction, requiring the panels to be
12 "fitted on or into a prepared opening" would exclude some examples of the invention discussed in
13 the specification. For instance, a projection screen is not necessarily "fitted on or into a prepared
14 opening." Nonetheless, a projection screen could be described as a "panel," within that term's
15 plain and ordinary meaning.

16      SAGE also offers an extrinsic definition of the term "glazing panel" from the HUD
17 Minimum Property Standards, 1973 ed. But extrinsic evidence is generally "less reliable than the
18 patent and its prosecution history in determining how to read claim term." Phillips, 415 F.3d at
19 1318. Because intrinsic evidence contained in the specification defines "glazing panel" more
20 broadly, the Court is not persuaded by SAGE's single cherry-picked extrinsic reference.

21      Therefore, the Court largely adopts View's proposed construction, which comports with
22 the specification's definition of glazing and does not import an additional limitation.[5] The Court
23 will construe the term as "a piece of any essentially transparent material made of glass and/or
24 polymer."

---

[5] SAGE argues that View's construction requires that the panel be a "flat piece," although the specification allows for the possibility that the glazing panel could be a used a side window in a car and such windows are typically somewhat curved. The Court will therefore omit the word "flat" from View's proposed construction.

10

C.  The '336 and '850 Patents
1.  "Metallurgically bonded" ('336 Patent, claim 1; '850 patent, claims 16, 36)

| Disputed Claim Term | SAGE's Proposed Construction | View's Proposed Construction |
|---|---|---|
| Metallurgically bonded | An interface between metallic layers at which the metallic layers are substantially bonded to one another and in which the interface consists essentially of metals and intermetallic compounds. | An interface between metallic layers at which the metallic layers are substantially bonded to one another (rather than simply compressed together) and in which the interface consists essentially of metals and intermetallic compounds. |

Both parties agree that the '336 Patent defines "metallurgical bond" as "an interface between metallic layers at which the metallic layers are substantially bonded to one another and in which the interface consists essentially of metals and intermetallic compounds." '336 Patent at 3:12-17. The parties' dispute concerning the term "metalurgically bonded" turns on whether SAGE stated during patent prosecution that, in order to be "substantially bonded to one another," the layers may not be "simply compressed together." View contends that SAGE made an "express disavowal" during prosecution that the Kuo prior art reference, wherein lithium was "compressed into engagement" with a metallic supporting layer, was metallurgically bonded. ECF No. 209 at 23-24.

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." Omega Eng'g, Inc, v. Raytek Corp., 334 F.3d 1314, 1323 (Fed. Cir. 2003). "[F]or prosecution disclaimer to attach," however, "the alleged disavowing actions or statements made during prosecution must be both clear and unmistakable." Id. at 1325-26.

View justifies its proposed construction by gesturing to the patentee's response to the Patent and Trademark Office's initial rejection of what would become claim 1 of the '336 Patent. The PTO initially rejected the claim as obvious in light of three prior art references, including the Kuo reference. In the rejection, the examiner stated that "Kuo . . . shows that lithium metal

11

1   electrode is supported on the copper surface," but acknowledged that "[t]he difference between the
2   instant claimed invention and Kuo is that Kuo does not show that lithium is bonded to the copper
3   surface." ECF No. 209-5 at 2. Nonetheless, the examiner concluded that Kuo and another
4   reference taken together demonstrated it was "well known in the art to use lithium as electrode
5   material for any purpose such as sputtering." Id.

Responding to the rejection, the patentee distinguished Kuo by drawing upon the examiner's prior discussion of Kuo:

> Kuo deals with a method of making a storage battery anode with a copper foil clad by lithium foil. The lithium is compressed into engagement in indentations formed in the copper foil. As the Examiner expressly acknowledges, Kuo does not show that "lithium is bonded to the copper surface." Clearly, Kuo does not teach the specific metallurgical bond between a metallic lithium layer and a supporting layer as recited in claim 33. Nor does Kuo teach using his battery electrode structure as a sputtering target, or suggest what would happen if one were to do so.

ECF No. 209-4 at 4.

SAGE argues that because the examiner acknowledged in the initial rejection of the claim that Kuo did not teach a bond, the patentee's response was not a disavowal of claim scope intended to overcome the prior rejection. SAGE contrasts this with the patentee's statement in his response that Kuo did not "teach using his battery electrode structure as a sputtering target, or suggest what would happen if one were to do so," which SAGE acknowledges was a statement intended to distinguish the patent from the Kuo prior art reference. Id.

SAGE also persuasively highlights that View's proposed construction ignores the full statement made by the patentee in response to the rejection, which distinguished the Kuo reference as teaching a method where "lithium is compressed into engagement in indentations formed in the copper foil." Id. By proposing the parenthetical "rather than simply compressed together" to capture this statement, View overstates the patentee's alleged disavowal. The patentee's statement indicates the compressions involving indentations formed into copper foil in the Kuo reference were not metallurgical bonds, not that a form of compression could never constitute a "substantial[] bond[]."

The Court therefore agrees with SAGE that the prosecution history does not conclusively

12

1 demonstrate a disavowal of claim scope that accords with View's proposed construction.
2 Therefore, the Court will adopt SAGE's proposed construction of the term, which accords with the
3 definition of "metallurgical bond" provided within the specification. See 3M Innovative
4 Properties Co. v. Avery Dennison Corp., 350 F.3d 1365, 1373 (Fed. Cir. 2003) (stating that
5 "[w]hen the patentee has expressly defined a term in the specification and remarks made to
6 distinguish claims from the prior art are broader than necessary to distinguish the prior art, the full
7 breadth of the remark is not a clear and unambiguous disavowal of claim scope as required to
8 depart from the meaning of the term provided in the written description.").

### D. The '850 Patent

#### 1. "Independently-controllable" (claims 1, 2, 10, 14, 18, 21)

| Disputed Claim Term | SAGE's Proposed Construction | View's Proposed Construction |
|---|---|---|
| Indepedently-controllable | The control voltage to obtain the desired tinting of each zone is electrically isolated from the control voltage applied to each other zone | No construction necessary, plain and ordinary meaning |

View asserts that the meaning of the term "independently-controllable" is clear and unambiguous and therefore requires no construction. SAGE asks the Court to construe "independently-controllable" in a manner that would indicate that adjacent zones in the multi-pane window cannot share a common bus bar. View responds that SAGE's construction imports limitations from other portions of the claim.

The Court concludes that the term does not require construction. The Court agrees with View that SAGE's construction seeks to import a limitation from the specification that is not justified by the language of the claim. SAGE argues that Figure 2 of the specification does not disclose a shared common bus bar between zones and "[n]one of the other embodiments in the specification include a common bus bar." But "particular embodiments appearing in the written description [should] not be used to limit claim language that has broader effect." Innova/Pure

13

1   Water, 381 F.3d at 1117.  "[E]ven where a patent describes only a single embodiment, claims will
2   not be "read restrictively unless the patentee has demonstrated a clear intention to limit the claim
3   scope using 'words or expressions of manifest exclusion or restriction.'" Id. (quoting Liebel-
4   Flarshiem Co. v. Medrad, 358 F.3d 898, 906 (Fed. Cir. 2004)).

Nothing in the patent or specification evinces the patentee intended to limit the claim scope in such a restrictive manner.  Indeed, the patent describes Figure 2 as "one exemplary embodiment," '870 Patent at 2:16, and the specification clearly states that "[a]ny embodiment described herein as 'exemplary' is not to be construed as necessarily preferred or advantageous over other embodiments." Id. at 1:46-49.

Furthermore, the concept of separate zones being "independently-controllable" can be easily understood by juries to mean that an operator can control one zone without affecting another zone.  SAGE's proposed construction, requiring that the "control voltage[s]" of distinct zones be "electrically isolated" introduces additional complexity and departs significantly from the term's ordinary and customary meaning.  Because SAGE's proposed construction is not mandated by any other claim language, the Court declines to adopt it.

The Court therefore finds the term "independently-controllable" does not require construction.

### 2.      "Electrically-isolating"(claims 1, 2, 3, 4)

| Disputed Claim Term | SAGE's Proposed Construction | View's Proposed Construction |
|---|---|---|
| Electrically isolating | No current flows between adjacent zones (other than a de minimis amount) | No construction necessary, plain and ordinary meaning |

The parties' dispute over this term centers on whether the construction should mandate that no current can flow between adjacent zones other than a de minimis amount.  View asserts that the term "electrically isolating" also does not require construction and should be given its plain and ordinary meaning.  SAGE argues for a construction, which it asserts is the plain and ordinary

14

meaning, wherein "no current flows between adjacent zones (other than a de minimis amount)."

View notes that the specification suggests something less than perfect isolation by indicating that the barriers between zones are "highly isolating," '870 Patent at 3:1-9, and "provide[] excellent electrical isolation characteristics between dynamic zones." Id. at 3:32-36. View argues that the use of "highly isolating" and "excellent electrical isolation" indicate that isolation, while exceptional, is not perfect. SAGE in turn acknowledges that "perfect isolation" is "a likely technical impossibility." ECF No. 208 at 22. Therefore, SAGE's proposed construction would permit a "de minimis amount" of current flow between adjacent zones. "De minimis" is a legal term and not a turn of phrase with which the average juror is likely to be familiar. Its inclusion in a construction would only serve to create additional confusion, as the terms "isolating" or "isolation" are likely readily familiar to most jurors. Therefore, the Court does not believe the term "isolation" requires construction. The parties can dispute whether "isolation" requires perfect or something less than perfect isolation before the jury.

Although jurors are likely to understand what isolation means, the concept of "electrical isolation" may be unfamiliar. SAGE argues that this kind of isolation would mean that no current flows between adjacent zones. View responds that this would go too far, as the term, when used in claims 1-4 of the '850 patent, refers to certain discrete "electrically-isolating area[s]" but does not prohibit any current flowing between adjacent zones at all places on the device.

View appears to fear that SAGE's construction of "electrically isolated" would prohibit embodiments where adjacent zones share a common bus bar. View's brief includes a figure demonstrating a device containing two zones which share a common bus bar on one end, but are separated by an "electrically isolating area," or barrier, in between the zones. ECF No. 211 at 10. Although this embodiment is not included in the specification, View argues that nothing in the claim itself forecloses this embodiment. Nonetheless, View asserts that SAGE's construction of the term could be read exclude this embodiment, even though it contains an "electrically-isolating area" between the two electrochromic zones of the window as required by the claim term.

The Court does not see any reason why SAGE's construction of the claim term would have the effect of excluding an embodiment where two adjacent zones share a common bus bar. The

construction only requires isolation of current flow between the zones in those portions of the claim that discuss "electrically-isolating areas."  The construction does not mandate that adjacent zones cannot have any current flow between them in any portion of the device, even including through a common bus bar.

The Court construes "electrically isolating area" in claims 1-4 to mean "area where current flow between adjacent zones is isolated."  "Electrically isolates" in claim 18 is construed to mean "isolates current flow between adjacent zones."

## IV.   CONCLUSION

The Court, for the foregoing reasons, construes the terms as identified herein.

**IT IS SO ORDERED.**

Dated: May 6, 2015

_____
JON S. TIGAR
United States District Judge